In re Natalie **LOUGHRAN**, also known as Vickie Lockwood

and

Carolyn **Kikumura**, also known as Carol Kimura.

**Misc. No. 1598.**

United States District Court Central District California.

Aug. 30, 1967.

John K. Van de Kamp, United States Atty., Richard M. Coleman, Asst. United States Atty. and Chief of Sp. Prosecutions Div., Stephen D. Miller, Asst. United States Atty. and Assistant Chief of Sp. Prosecutions Div., and Gerald F. Uelman, Asst. United States Atty., Los Angeles, Cal., for the United States.

Daniel N. Busby and Thomas F. Call, Los Angeles, Cal., for Natalie Loughran, also known as Vickie Lockwood.

Thomas F. Call, Los Angeles, Cal., for Carolyn Kikumura, also known as Carol Kimura.

## ORDERS GRANTING IMMUNITY AND COMPELLING TESTIMONY BEFORE GRAND JURY

HAUK, District Judge.

These proceedings arise out of the investigation of interstate racketeering, wagering, gambling and related activities in southern California, Nevada, Florida and the East Coast being conducted by the Central District Grand Jury, Philip T. Wilson, Foreman,[1] with its inquiry focused upon alleged violations of the Federal Statutes prohibiting the Interstate Transmission of Wagering Information;[2] Interstate Interference with Commerce by Threats or Violence (Racketeering and Extortion);[3] Interstate and Foreign Travel or Transportation in aid of Racketeering Enterprises;[4] Interstate Transportation of Wagering Paraphernalia;[5] Attempt to Evade or Defeat Occupational Tax (Wagering);[6] Violations of the Federal Communications Act;[7] and other violations of the laws of the United States.

At the time of these proceedings the Grand Jury had begun to zero in specifically upon a meeting of big-name gamblers and underworld figures reportedly held in October 1965 at the Palm Springs residence of two Las Vegas showgirls, the Grand Jury witnesses who are here now before the Court: Natalie Loughran (who uses the stage name of Vickie Lockwood) and Carolyn Kikumura, who is also known as Carol Kimura.

Two alleged participants in the meeting were Vincent (Jimmy Blue Eyes) Alo, and Anthony (Fat Tony) Salerno, reputed New York members of the Cosa Nostra "family" headed by Vito Genovese. Perhaps because Genovese was a top delegate to the infamous convention of sixty crime chieftains November 14, 1957 at Apalachin, New York,[8] this Palm

---

1. Originally impanelled on September 22, 1966, this "Wilson" Grand Jury was due to wind up its work and be discharged at the end of the court session, the first Monday in March (the 7th) 1967. Local Rule 16, U.S.D.C., C.D.Cal. However, its term was extended by the March 3, 1967 Order of Chief Judge Thurmond Clarke until May 8, 1967; and again by his May 3, 1967 Order its term was extended to March 21, 1968, for the full eighteen months provided in Rule 6(g), Federal Rules of Criminal Procedure.

2. 18 United States Code § 1084.

3. 18 United States Code § 1951.

4. 18 United States Code § 1952.

5. 18 United States Code § 1953.

6. 26 United States Code §§ 4411, 4412, 7201.

7. 47 United States Code §§ 203, 501.

8. The delegates to this "Big Apalachin" meeting were prosecuted and convicted for conspiracy to commit perjury and obstruct justice by giving false and evasive testimony concerning the convention. United States v. Bonanno, 177 F.Supp. 106 (S.D.N.Y.1959) United States v. Bananno, 178 F.Supp. 62 (S.D.N.Y.1959.) Later these convictions were reversed

Springs meeting was quickly dubbed "Little Apalachin" by the press.[9]

Others who reportedly attended the Palm Springs gathering, which apparently lasted for several days, were Jerome (Jerry) Zarowitz, credit manager of Caesar's Palace on the Las Vegas "Strip", Elliott Paul Price, a host at Caesar's Palace, and Ruby (Fat Ruby) Lazarus, prominent Miami Beach and New York City bookmaker.[10]

## INITIAL COURT HEARING: ORDERS CONFIRMING IMMUNITY AND COMPELLING TESTIMONY

In response to subpoenas, the two showgirls appeared on December 15, 1967 before the "Wilson" Grand Jury in the United States Court House, Los Angeles, and each of them was questioned separately. Prior to questioning, of course, each was sworn, asked her correct name and stage name and, after admitting she had had an opportunity to consult with counsel, was advised that the purpose of the Grand Jury was to investigate violations of the laws of the United States and particularly those dealing with interstate racketeering, wagering, gambling and related activities. The statutes hereinabove referred to and cited at Footnote 1 were specifically mentioned.[11] Then each witness was informed that she was not before the Grand Jury as a prospective defendant but rather as a witness with information that could aid in the investigation. Each admitted that her attorney had explained her constitutional

rights to her, including her right under the Fifth Amendment to answer any questions, the truthful answer to which might tend to incriminate her personally of a crime.[12]

Each witness was advised that one of the statutes with which the Grand Jury was concerned related to the Federal Communications Act which contains provisions whereby, if she should assert the Fifth Amendment rather than answer the questions, the Grand Jury might seek the help of the Court to order her to answer the questions. Moreover, each witness was told that any such order would operate to grant her immunity so that she could not be prosecuted for anything she might answer in response to the questions propounded by the Grand Jury, with the cautionary admonition, however, that this immunity would not extend to perjury.[13]

Finally, each witness was warned that it was the Grand Jury's determination to ask the Court to confirm the immunity and compel her to answer, should she assert the Fifth Amendment and refuse to answer.[14]

After these preliminaries, each witness was asked the following questions and invoked the Fifth Amendment in reply: [15]

"Q Miss Kikumura, do you know Jerry Zarowitz?

"A I refuse to answer on the grounds that it may tend to incriminate me.

"Q Do you know Elliott Paul Price?

---

for lack of sufficient evidence to support a finding that defendants had agreed to lie about the gathering or that they had reason to anticipate that any of them would be called to testify under oath. Reversed sub nom. United States v. Bufalino, 285 F.2d 408 (C.A.2d 1960). Nevertheless the prosecution did reveal the scope of relationships among national crime syndicate leaders and the Cosa Nostra (loosely translated "our business"), the modern name for the Mafia, the most powerful and indissoluble crime organization in the history of mankind.

9. Los Angeles Times, December 18, 21, 25, 1966; Los Angeles Herald-Examiner

December 18, 21, 22, 1966; Riverside Daily Enterprise, December 21, 24, 1966.

10. According to the news articles cited in Footnote 9 supra.

11. Rep.Tr., Dec. 15, 1966, pp. 8-9.

12. Rep.Tr., Dec. 15, 1966, pp. 9-10.

13. Rep.Tr., Dec. 15, 1966, p. 10.

14. Rep.Tr., Dec. 15, 1966, p. 11.

15. Miss Kikumura: Rep.Tr., December 15, 1966, page 11, line 12, through page 14, line 6.

"A I refuse to answer on the grounds that it may tend to incriminate me.

"Q Do you know Tony Salerno?'

"A I refuse to answer on the grounds it may tend to incriminate me.

"Q Do you know Vincent Alo?

"A I refuse to answer on the grounds it may tend to incriminate me.

"Q Do you know Ruby Lazarus?

"A I refuse to answer on the grounds it may tend to incriminate me.

"Q In October of 1965 were you present at a meeting in Palm Springs, California, or Jerry Zarowitz, Elliott Paul Price, Tony Salerno, Vincent Alo and Ruby Lazarus?

"A I refuse to answer on grounds it may tend to incriminate me.

"Q Did the meeting take place at 893 Camino del Sur, Palm Springs, California, in October of 1965?

"A I refuse to answer on grounds it may tend to incriminate me.

"Q Did you reside at 893 Camino del Sur, Palm Springs, California, at any time during October 1965?

"A I refuse to answer on grounds it may tend to incriminate me.

"Q Did you observe the telephones at 893 Camino del Sur, Palm Springs, California, being used for the purpose of placing wagers?

"A I refuse to answer on ground it may tend to incriminate me.

"Q Were the phones used by Tony Salerno for the purpose of conducting gambling business?

"A I refuse to answer on ground it may tend to incriminate me.

"Q Did Ruby Lazarus use the phones to place or lay off wagers?

"A I refuse to answer on ground it may tend to incriminate me.

"Q Did Jerry Zarowitz use the phones to call Las Vegas to transmit wagering information?

"A I refuse to answer on ground it may tend to incriminate me.

"Q Did Elliott Paul Price use the phones to call Massachusetts to conduct a gambling operation?

"A I refuse to answer on ground it may tend to incriminate me.

"Q Who paid the bill for the charges incurred in October for the use of the telephones at 893 Camino del Sur, Palm Springs, California?

"A I refuse to answer on ground it may tend to incriminate me.

"Q Miss Kikumura, you are excused from the room. I would ask you to stay in attendance at the hall because we will be proceeding presently to the court.

"A Thank you."

In addition to those same questions asked of Miss Kikumura, Miss Loughran was asked two further questions:[16]

"Q For what purposes was an additional phone, No. 325–6896, installed in the residence at 893 Camino del Sur, Palm Springs, California, on October 11, 1965?

"A I refuse to answer on the grounds that the answer may tend to incriminate me.

"Q Who ordered the additional phone installed at the residence at 893 Camino del Sur, Palm Springs, California?

"A I refuse to answer on the grounds that the answer may tend to incriminate me."

Immediately after this interrogation, the Assistant United States Attorney brought the Grand Jury and the witnesses Kikumura and Loughran before

16. Miss Loughran: Rep.Tr., December 15, 1966, page 19, lines 2–16.

the Court and filed the following *"APPLICATION FOR IMMUNITY"*:[17]

"The United States of America moves this Honorable Court for an order instructing Natalie Loughran, also known as Vickie Lockwood, and Carolyn Kikumura, also known as Carol Kimura, to testify and produce evidence pursuant to the provisions of Title 47, United States Code, Section 409 (1), and respectfully alleges as follows:

"1. On December 13, 1966, a duly constituted grand jury began an inquiry into alleged violations of the Federal statutes prohibiting the Interstate Transmission of Wagering Information, Title 18, United States Code, Section 1084; Interstate Transportation in Aid of Racketeering, Title 18, United States Code, Section 1952; Interstate Transmission of Wagering Paraphernalia, Title 18, United States Code, Section 1953; Attempt to Evade Occupational Tax (Wagering), Title 26, United States Code, Sections 4411, 4412, 7201; and violations of the Federal Communications Act, Title 47, United States Code, Sections 203 and 501, and other violations of the laws of the United States.

"2. Natalie Loughran, also known as Vickie Lockwood, and Carolyn Kikumura, also known as Carol Kimura, were subpoenaed to appear and did appear before the grand jury on December 15, 1966.

"3. In response to numerous questions related to activities falling within the scope of the above statutes, respondents invoked the Constitutional privilege against self-incrimination and refused to answer.

"4. This application for immunity is being made in good faith, with the personal approval of the Attorney General, in the belief that the witnesses can give important testimony which will be pertinent to the grand jury inquiry.

"WHEREFORE, the United States of America requests the Court to ORDER Natalie Loughran, also known as Vickie Lockwood, and Carolyn Kikumura, also known as Carol Kimura, to answer the questions which they have heretofore refused to answer, and to testify and produce evidence relating to all matters pertinent to the pending grand jury inquiry, pursuant to the provisions of Title 47, United States Code, Section 409(1)." [18]

After ascertaining that both witnesses were represented by counsel, Miss Loughran by two attorneys, Daniel N. Busby, Esq., and Thomas F. Call, Esq., and Miss Kikumura by Mr. Call, the Court, pursuant to Federal Rules of Criminal Procedure, Rule 6(e) [19] direct-

---

17. Perhaps the title might better have been "APPLICATION FOR CONFIRMATION OF IMMUNITY AND COMPULSORY TESTIMONY OF WITNESS BEFORE GRAND JURY".

18. "47 United States Code.

§ 409(*l*) *Self incrimination*

No person shall be excused from attending and testifying or from producing books, papers, schedules of charges, contracts, agreements, and documents before the Commission, or in obedience to the subpena of the Commission, whether such subpena be signed or issued by one or more commissioners, or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of this chapter, or of any amendments thereto, on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to incriminate him or subject him to a penalty or forfeiture; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, documentary or otherwise, except that any individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying."

19. "Federal Rules of Criminal Procedure, Rule 6(e).

*Secrecy of Proceedings and Disclosure.* Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may

ed the Grand Jury's certified shorthand reporter to take the stand, testifying and read from her notes the Grand Jury's questions and the answers of the witnesses thereto, as hereinabove set forth.

Thereupon, counsel for both witnesses were given an opportunity to ask any questions but they declined to do so.

■■ In this state of the record, it is clear that the Court has the duty to invoke its civil contempt power which must be exercised in two stages. *First,* the Court will make its order recognizing and confirming the immunity automatically granted to the witnesses under the Federal Communications Act, 47 United States Code § 409(*l*) by compelling the witnesses to answer the questions before the Grand Jury. *Secondly,* if they refuse to comply with the Court order and persist in declining to answer the questions of the Grand Jury, the Court will hold them in civil contempt and commit them to custody until they shall comply with the Court order and answer the questions. Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); In re Grand Jury Investigation of Giancana, 352 F.2d 921 (C.A.7th, 1965) cert. den. 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362 (1965); United States v. Coplon, 339 F.2d 192 (C.A.6th, 1964).

The pertinent provisions of the Immunity Section of the Federal Communi-

cations Act, 47 United States Code § 409 (*l*) compel testimony and the witness cannot refuse to answer on grounds of self-incrimination. But "no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, documentary or otherwise, except that any individual so testifying shall not be. exempt from prosecution and punishment for perjury committed in so testifying." [20]

This section, like other immunity statutes, is patterned after the Compulsory Testimony Act of 1893 (27 Stat. 443, 49 U.S.Code § 46) which related to proceedings under the Interstate Commerce Act. The Act of 1893 was upheld in Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896) and for this reason was made the basis of later immunity statutes, including the Federal Communications Act immunity which cloaks the two witnesses now here before the Court.

Provisions in similar language appear in at least twenty-six other Acts of Congress, and all of the provisions are identical with the Federal Communications Act provision in the scope of the immunity afforded.[21]

Brown v. Walker, supra, involved a refusal to testify upon a claim of privilege

---

be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule. The court may direct that an indictment shall

be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons."

20. See the text of 47 U.S.C. § 409(*l*) in Footnote 18, supra.

21. For a comprehensive history of federal immunity legislation, see Dixon, The Fifth Amendment and Federal Immunity Statutes, 22 Geo.Wash.L.Rev. 447 (1954).

See also: VIII WIGMORE, EVIDENCE (3d ed. 1940) Sec. 2281, n. 11, pp. 495–6.

in a grand jury investigation of violations under the Interstate Commerce Act. The Court analyzed the Act of 1893 in the light of tests laid down in the earlier case of Counselman v. Hitchcock, 142 U. S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). In *Counselman*, the Court held an 1868 immunity statute invalid because it did not afford absolute immunity against future prosecution. In noting that, the Act of 1893 met the requirements declared essential in *Counselman*, the Supreme Court in Brown v. Walker stated at page 610 of 161 U.S. (16 S.Ct. 652, 40 L.Ed. 825):

> "While the constitutional provision is justly regarded as one of the most valuable prerogatives of the citizen, its object is fully accomplished by the statutory immunity, and we are therefore of opinion that the witness was compellable to answer, and that the judgment of the court below must be affirmed."

■ Numerous Circuit Courts of Appeal have had occasion to construe the immunity provisions of 47 United States Code § 409(*l*) and have uniformly held that the immunity conferred by the statute involved here is the automatic statutory consequence of compulsory testimony. It is true that it falls into the group of statutes which require a witness to claim self-incrimination in order to testify and gain immunity from prosecution. But once that is done by the witness, the immunity provision of the Federal Communications Act, 47 U.S.C. § 409(*l*) is "self-executing". Marcus v. United States, 310 F.2d 143, 146 (C.A. 3rd, 1962), cert. den. 372 U.S. 944, 83 S.Ct. 933, 9 L.Ed.2d 969 (1963); In re Grand Jury Investigation of Giancana, 352 F.2d 921, 925 (C.A.7th, 1965), cert. den. 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed. 2d 362 (1965); United States v. Coplon, 339 F.2d 192, 193 (C.A.6th, 1964).

■ Moreover, the immunity is as extensive as the testimony. In other words, it is not limited to proceedings or questions based upon or growing out of the Federal Communications Act, and it extends to both Federal and State prosecutions. Marcus v. United States, supra, 310 F.2d at pages 146–147; In re Grand Jury Investigation of Giancana, supra, 352 F.2d at 924–925; United States v. Coplon, supra, 339 F.2d at 193; Murphy v. Waterfront Commission, 378 U.S. 52, 54, 79–80, 84 S.Ct. 1594, 1596, 1610, 12 L.Ed.2d 678, 681, 695–696 (1964).

■ It is elementary that a grand jury is an arm of the court and that refusal to comply with an order of court directing a witness to answer proper questions before a grand jury is a contempt of court. Marcus v. United States, 310 F.2d 143, 146 (C.A.3d, 1962). The appropriate procedure is summarized in Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627 (1966):

> "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt. United States v. United Mine Workers, 330 U.S. 258, 330–332 [67 S.Ct. 677, 713–714, 91 L. Ed. 884] (1947) (Black and Douglas, JJ., concurring in part and dissenting in part); United States v. Barnett, 376 U.S. 681, 753–754 [84 S.Ct. 984, 1019–1020, 12 L.Ed.2d 23] (1964) (Goldberg, J., dissenting). And it is essential that courts be able to compel the appearance and testimony of witnesses. United States v. Bryan, 339 U.S. 323, 331 [70 S.Ct. 724, 730, 94 L. Ed. 884] (1950). A grand jury subpoena must command the same respect. Cf. Levine v. United States, 362 U.S. 610, 617 [80 S.Ct. 1038, 1043, 4 L.Ed. 2d 989] (1960). Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance. McCrone v. United States, 307 U.S. 61 [59 S.Ct. 685, 83 L.Ed. 1108] (1939); Giancana v. United States, 352 F.2d 921 (C. A.7th Cir.), cert. denied, 382 U.S. 959

[86 S.Ct. 437, 15 L.Ed.2d 362] (1965).[6] The conditional nature of

"n.6 The court may also impose a determinate sentence which includes a purge clause. This type of sentence would benefit an incorrigible witness. It raises none of the problems surrounding a judicial command that unless the witness testifies within a specified time he will be imprisoned for a term of years. See Reina v. United States, 364 U.S. 507 [81 S.Ct. 260, 5 L.Ed.2d 249] (1960).

the imprisonment—based entirely upon the contemnor's continued defiance —justifies holding civil contempt proceedings absent the safeguards of indictment and jury. Uphaus v. Wyman, 364 U.S. 388, 403–404 [81 S.Ct. 153, 155, 5 L.Ed.2d 148] (1960) (Douglas, J., dissenting), provided that the usual due process requirements are met.[7]

"n.7 See Parker v. United States, 153 F. 2d 66, 70 [163 A.L.R. 379] (C.A. 1st Cir. 1946)."

■ Taking the first step, then, in appropriate civil contempt against the two witnesses, the Court compelled them to testify before the Grand Jury, the Loughran mandate reading:[22]

"ORDER. The United States of America, having on this date made written and oral application for an order compelling Natalie Loughran, also known as Vickie Lockwood, to testify and produce evidence before a duly constituted Grand Jury of the Central District of California, pursuant to Title 47, United States Code, Section 409(1); and

"The said Natalie Loughran, also known as Vickie Lockwood, on December 15, 1966, having declined to answer questions before the said Grand Jury on the ground that her answers might tend to incriminate her, the aforesaid Grand Jury then and there inquiring, *inter alia,* into possible violations of

Title 47, United States Code, Sections 203, 501 and of Title 18, United States Code, Section 1084; it is

"ORDERED, that the said Natalie Loughran, also known as Vickie Lockwood, appear forthwith before said Grand Jury and that she be and hereby is ordered and compelled to testify and produce evidence with respect to the matters under inquiry before the said Grand Jury.

"DATED: December 15, 1966.
A. ANDREW HAUK /s/
A. ANDREW HAUK
United States District Judge"

SECOND HEARING: ORDER APPOINTING PSYCHIATRIST TO EXAMINE WITNESS LOUGHRAN

The next day (December 16, 1966) the Grand Jury and Assistant United States Attorneys returned to the Court with the witness Natalie Loughran and an oral application for appointment of a psychiatrist to examine her, requesting the Court again to make public certain portions of the Grand Jury transcript essential to the application. Once again after ascertaining that the witness Loughran was represented by her attorney, Daniel N. Busby, Esq., who was present, the Court ordered the Grand Jury's certified shorthand reporter to disclose the testimony of the witness Loughran that morning before the Grand Jury:

"Q. What did you do with that money before utilizing it to make a down payment? Did you deposit it in some account of yours?

"A. I probably did. I don't remember.

"Q. Which account, Miss Loughran?

"A. Well, I only have one bank.

"Q. Are you certain of that, Miss Loughran?

"A. I am not even certain of anything any more.

22. An identical order was made compelling the witness Kikumura similarly to appear forthwith and testify before the Grand Jury.

"Q. Well, it would be for your own good for you to attempt to be certain and think about these answers before you give them.

"A. I told you I am really not capable of answering any of your questions.

"Q. Miss Loughran, do you feel as though it would be helpful for you to be examined by a medical doctor to determine your capacity to testify here?

"A. I don't know that a medical doctor would be of any assistance to you. If he conferred with my psychiatrist, perhaps, as to my emotional status and my irrationality when I become emotional and find that I am suicidal and have a low emotional ebb, fine. Because that is really where it is. That is the truth.

"Q. Well, Miss Lockwood, if you feel that you are not capable of truthfully and accurately answering our questions by reason of the fact that your mind is for some reason clouded, then perhaps it would be advisable to have the District Court appoint a psychiatrist who would conduct an examination of you to determine what your present mental status is.

"A. That would be fine. That would be definitely fine.

"Q. Miss Loughran, I am going to ask the foreman of the Grand Jury to excuse you from this room to remain on this floor so that a United States District judge can be contacted and suitable arrangements may be made today for your examination, so that this Grand Jury may have the results of that examination and continue its investigation.

"A. That is fine.

"Q. Would the foreman so direct.

"THE FOREMAN: You are so ordered." [23]

Whereupon the following proceedings occurred in Court:

"BY MR. COLEMAN:

"Q. Does that conclude her testimony?

"A. That does, Mr. Coleman.

"Q. Which Assistant U. S. Attorney was asking those questions?

"A. Mr. Stephen Miller.

"MR. COLEMAN: Your Honor, I have nothing further of Miss Pearson.

"THE COURT: You may step down.

"Is the witness Natalie Loughran, also known as Vickie Lockwood, here?

"MR. BUSBY: The respondent is present with Attorney Daniel Busby.

"THE COURT: I think I would like to have her take the stand and see how she is feeling, and let the court have a feeling about it. I will ask her a few questions.

"Come over here and be sworn.

"NATALIE LOUGHRAN, called by the court, being first duly sworn, testified as follows:

"THE CLERK: Please be seated.

"State your full name for the record, please.

"THE WITNESS: Natalie Loughran.

"THE COURT: You are also known as Vickie Lockwood?

"THE WITNESS: Victoria Lockwood.

"THE COURT: You recall yesterday I made an order that you should answer questions propounded to you by the Assistant U. S. Attorney in the Grand Jury room before the Grand Jury; do you remember that?

"THE WITNESS: Yes.

"THE COURT: And the order provides that you—in view of the fact that you have been granted immunity, that is, you cannot be charged or prosecuted in connection with any matters for any offenses in connection with any matters

that you would be examined upon in the Grand Jury, you understand that?

"THE WITNESS: Yes.

"THE COURT: In view of that, the court ordered that you answer. Do I understand that you just don't remember, or you are ill, or what is it why you don't answer the questions?

"THE WITNESS: Well, I thought—I was trying to answer to the best of my ability. Unfortunately I am rather confused.

"THE COURT: Well, I suppose everybody gets confused at times. Aren't you able to answer these questions?

"THE WITNESS: Well, sir, I have pains behind my ears, it is hard to explain them, actually; they are like shooting pains up the back of my head, and I just don't feel very well.

"THE COURT: You see, because if the court came to the conclusion and made a finding that you were deliberately not answering these questions, although you had the ability to, and that you were saying you don't remember or you can't remember, and so on, and you were, in effect, say, kidding the Grand Jury, not telling the truth, I have the power to commit you for contempt. You understand that?

"THE WITNESS: Yes, sir, I do.

"THE COURT: And to find you guilty of criminal contempt, and sentence you until you are willing to answer questions. You understand that?

"THE WITNESS: Yes.

"THE COURT: You are telling the court, are you, that you are trying to answer the questions to the best of your ability?

"THE WITNESS: Yes.

"THE COURT: Would you like to go back and try to answer the questions again?

"THE WITNESS: No.

"THE COURT: Have another chance?

"THE WITNESS: Not now.

"THE COURT: Why not?

"THE WITNESS: I don't feel capable of doing that right now.

"THE COURT: Why not? What is it that bothers you?

"THE WITNESS: I just feel absolutely ill, that's all.

"THE COURT: Physically?

"THE WITNESS: Mentally, physically; my stomach, my head.

"THE COURT: Well, I am going to do this. You are represented here by counsel, Mr. Busby?

"MR. BUSBY: That is correct, your Honor.

"THE COURT: Do you have any questions you want to ask her?

"MR. BUSBY: No, your Honor.

"THE COURT: Mr. Coleman has asked that the court appoint a psychiatrist from the panel, qualified panel of court psychiatrists, to examine you, Miss Loughran, and determine and report to the court whether or not you are capable of answering and able to understand the proceedings, and physically and mentally able to be present and continue to be examined.

"May I ask this? If I make the order that you appear at a certain place, will you definitely promise to appear there?

"THE WITNESS: Yes, sir.

"THE COURT: I mean to be examined by this doctor?

"THE WITNESS: Yes. I want to be examined.

"THE COURT: If I am not sure you would appear I have two marshals here, a man and a lady marshal, who will escort you there.

"THE WITNESS: There is no need for that." [24]

24. Rep.Tr. Dec. 16, 1966, p. 30, line 15—p. 34, line 23, incl.

Thereupon the Court made and entered the following "ORDER APPOINTING PSYCHIATRIST":

"The question of the mental competency of the respondent Natalie Loughran, also known as Vickie Lockwood, a duly subpoenaed witness before the duly constituted Grand Jury, having been raised, and the Court being advised that the aforementioned respondent has stated that she is so mentally incompetent as to be unable to understand the proceedings before the Grand Jury, or to answer questions propounded to her before said Grand Jury, and the Court being fully advised in the matter, and on its own motion, as well as the motion of the United States Attorney,

"IT IS ORDERED THAT Dr. Eric Marcus, whom the Court finds is a qualified and competent psychiatrist, be and he hereby is appointed to examine said respondent and report to this Court whether:

"1) The respondent is presently unable to understand the proceedings before the Grand Jury and to answer questions propounded to her before the Grand Jury; and

"2) What the probable prognosis of respondent's mental competency as respects the foregoing question shall be, whether permanent or temporary in nature; and whether the further appearance and questioning of the respondent before the Grand Jury would be temporarily or permanently injurious to her mental or physical health.

"IT IS FURTHER ORDERED that the respondent shall produce herself forthwith at 8820 South Sepulveda Boulevard, Los Angeles, California, and at such other times and places as the said Dr. Marcus may deem necessary for the purpose of such examination and that said respondent afford such cooperation and information as may be required in properly conducting such mental examination;

"IT IS FURTHER ORDERED that such examination be at the expense of the United States Government and the report of Dr. Marcus shall be sent to the undersigned Judge of this Court with copies to the plaintiff and to Daniel Busby, attorney for respondent whose address is 9000 Sunset Boulevard, Suite 900, Los Angeles 90069.

"DATED: December 16, 1966.

A. ANDREW HAUK /s/

A. ANDREW HAUK
UNITED STATES DISTRICT
JUDGE"

After this order was signed, a further colloquy took place in which the Court admonished the witness of the seriousness of the situation and the necessity of her dealing frankly with the Court and with the Grand Jury:

"THE COURT: Now, Miss Loughran, be sure and go along with your attorney now and appear at the office of Dr. Eric Marcus, 8820 South Sepulveda Boulevard, forthwith, for examination by Dr. Marcus in accordance with this order which I am now signing, I want to inform you of it, and your attorney will have a copy of it. Mr. Busby, in fact, has already been given a copy. It is to the effect that you should be so examined, and present yourself to Dr. Marcus' office for examination forthwith.

"This will be at the expense of the Government, and the report to be sent to the court on or prior to Tuesday morning at 9:30, at which time you, Miss Loughran, are directed and ordered to report here in this courtroom at 9:30, Tuesday morning, December 20, at 9:30. At that time the court will consider the report and determine what to do.

"I will suggest this, Miss Loughran. Be sure and be frank and completely open and frank with the psychiatrist. And I would further admonish you that we mean business, we are not fooling around. If you are able to remember and able to answer questions, you answer them, for there is only one alternative, and under the law we have to take that alternative, that is incarceration if you don't answer the questions.

"Whether you protect a boyfriend or girlfriend, or whatever it is, you have

been granted immunity and it is no excuse, you can't hide on the Fifth Amendment when you have been granted immunity.

"Do you understand that?

"THE WITNESS: Yes, sir.

"THE COURT: You be sure and be frank and honest with the psychiatrist" [25]

## THIRD HEARING: ORDER FINDING WITNESS LOUGHRAN MENTALLY COMPETENT AND COMPELLING TESTIMONY WITH PSYCHIATRIC AID AND TREATMENT AVAILABLE AT ALL TIMES.

On December 20, 1966, the Court convened at the time previously set for the purpose of hearing the testimony and examining the report of the court-appointed psychiatrist, Dr. Eric Marcus and the following proceedings occurred:

"MR. MILLER. [Stephen D. Miller, Assistant United States Attorney] Your Honor, once again the government and the Federal grand jury seeks the assistance of the court in regard to the matter of Natalie Loughran and her testimony before the grand jury.

"THE COURT: All right.

"MR. MILLER: At this time, your Honor, we wish to state that a copy of the psychiatric evaluation of Natalie Lockwood, prepared by Dr. Marcus, has been served upon defense counsel, together with the points and authorities in regard to the competency of a witness to testify.

"At this time, your Honor, the government would wish to call Dr. Marcus as a witness in support of the government's position that Natalie Loughran should be directed to answer questions before the grand jury as we had discussed the other day.

"THE COURT: Is Miss Lockwood here?

"MR. BUSBY: Yes, she is, your Honor.

"THE COURT: I wonder if counsel would come to the counsel table with her over here. I want to be sure she is present with counsel.

"Is the appearance indicated? Mr. Busby is representing Miss Lockwood.

"As I understand from my bailiff, she wasn't here when we started this proceeding, so we had better start over.

"Mr. Miller, you are appearing here in the case before this court entitled In the Matter of Natalie Loughran, also known as Vickie Lockwood, also known as Victoria Lockwood, Miscellaneous No. 1598—Criminal, on the question of Miss Lockwood or Loughran's competency and ability to testify as a witness before the grand jury, as ordered by the court upon the granting of immunity?

"MR. MILLER: That is correct.

"At this time the government would wish to call Dr. Eric Marcus to the stand to testify with regard to his examination of Miss Loughran as directed and ordered by the court.

"THE COURT: All right. Dr. Marcus.

"THE CLERK: Mr. Busby, would you please have counsel state his appearance?

"MR. CLARK: Dwain Clark, associated with Mr. Busby, if it please the court.

"THE COURT: All right.

"DR. ERIC MARCUS

called as a witness by and behalf of the government, having been first duly sworn, was examined and testified as follows:

"THE CLERK: Please be seated.

25. Rep.Tr. Dec. 16, p. 38, line 22—p. 40, line 4, incl.

"State your name for the record, please.

"THE WITNESS: Eric Marcus, M-a-r-c-u-s.

"DIRECT EXAMINATION:

"BY MR. MILLER:

"Q Dr. Marcus, what is your profession?

"A I am a psychiatrist.

"Q How long have you been a psychiatrist?

"A Since 1960.

"Q Doctor, where is your office located?

"A 8820 South Sepulveda Boulevard.

"Q Would you state the educational institutions that you attended in connection with the preparation for your profession?

"A I was trained at UCLA, Harbor General Hospital, and the Veterans Administration Hospital in Los Angeles.

"Q Are you licensed to practice medicine in the State of California?

"A Yes.

"Q Are you a member of any professional organizations?

"A Yes.

"Q Would you please state them? ·

"A In addition to the usual organizations that doctors belong to, I belong to a series of organizations in forensic psychiatry. These are organizations that deal with the law and psychiatry.

"Q Doctor, would you state what forensic psychiatry is?

"A This is the field of psychiatry that deals with legal matters, legal processes.

"THE COURT: What organizations? May I ask what organizations you belong to, Doctor?

"THE WITNESS: Yes. The American Society of Criminology, the Association for the Psychiatric Treatment of Offenders, the National Council on Crime and Delinquency; I am past president of the Southern California Society for Psychiatry and the Law; and I am currently secretary of the West Side Medical Legal Society.

"THE COURT: What do you belong to—what is your professional membership in any boards or associations indicating a specialization in psychiatry?

"THE WITNESS: Yes. I am a Diplomate of the American Board of Psychiatry and Neurology, and I of course belong to the Los Angeles County Medical Association and the American Medical Association.

"BY MR. MILLER:

"Q Doctor, have you had occasion to testify in court with respect to the examination of patients?

"A Yes.

"Q I take it that was in connection with psychiatric examinations?

"A That's correct.

"Q Have you had occasion to teach your speciality?

"A Yes.

"Q When has that occurred, sir?

"A I am currently an Assistant Clinical Professor of Psychiatry at USC, and I am involved in the teaching program of forensic psychiatry to attorneys, judges, probation officers.

"Q Have you been a consultant to any federal state or local governmental agencies?

"A Yes.

"Q Would you please state what those agencies have been?

"A I was formerly consultant to the California Youth Authority, and am currently consultant to the Los Angeles County Probation Department. Also, I consult at Terminal Island Prison for the Department of Justice.

"MR. MILLER: Your Honor, the government submits that Dr. Marcus has been qualified as an expert and may testify in this matter.

"THE COURT: Yes, I so find.

"BY MR. MILLER:

"Q Dr. Marcus, have you been appointed by the court to examine Natalie

Loughran, also known as Vickie Lockwood?

"A Yes.

"Q Have you had occasion to read the order of the court dated December 16, 1966, directing this examination?

"A Yes.

"Q Did you, in fact, conduct such an examination?

"A Yes, I did.

"THE COURT: Is she here in the court room?

"THE WITNESS: Yes.

"THE COURT: Can you point her out?

"THE WITNESS: The lady in the white leather coat.

"THE COURT: Seated at counsel table to my right?

"THE WITNESS: Yes.

"THE COURT: Let the record show he has pointed to the witness Natalie Loughran, also known as Vickie Lockwood.

"BY MR. MILLER:

"Q When did the examination of Miss Lockwood occur?

"A It took place last Saturday. That would be the 17th of December.

"Q Where did the examination take place, sir?

"A In my office.

"Q How long did the examination last?

"A The total examination lasted four and a quarter hours. That included, partly, psychological testing and, partly, interviewing.

"Q Would you state, sir, if you would, what the examination included, what procedures were utilized?

"A. The clinical aspect involved an interview. An interview includes, actually, more than just the words the patient speaks, but an observation of the patient's behavior. The other part of the examination was an extensive series of psychological testing.

"Q Would you describe for us what psychological testing was given, what tests were actually performed?

"A The Rorschach test, the thematic apperception test, the Wechsler adult intelligence scale, the Minnesota multiphasic personality inventory, the four-sentence completion test, the house-tree-person test.

"Q Doctor, what information was available to you and made available to you in connection with this case in your examination of Miss Loughran?

"A In addition to the report of the tests, I had some information from the U. S. District Attorney, U. S. Attorney Mr. Coleman, plus a brief conversation with Mr. Busby, and an interview with the witness' sister.

"THE COURT: Mr. Busby is Miss Loughran's attorney?

"THE WITNESS: Yes.

"THE COURT: What is the name of her sister?

"THE WITNESS: Her sister's name is Doris Gathrid.

"BY MR. MILLER:

"Q Of course you stated, did you, that you did have an interview with Miss Loughran herself?

"A Yes, I did.

"Q Did you talk to her with regard to the circumstances of this situation, that is, her testimony before the federal grand jury?

"A Yes.

"Q Doctor, have you formed an opinion as to whether Natalie Loughran can appreciate the obligation of an oath?

"A Yes.

"Q And what is that opinion, Sir?

"A My opinion is she can appreciate the obligations of an oath.

"Q Have you formed an opinion, Doctor, as to whether or not Miss Loughran has the capacity to give a correct account of matters which she has seen and heard, based upon questions propounded to her before the federal grand jury?

"A Yes, I feel she has that capacity.

"Q Doctor, would you state your reasons; that is, the reasons that you have in forming your opinion?

"A I feel that although at the beginning of the four-hour examination she was quite upset, by the time 45 minutes had elapsed she had calmed down sufficiently so that I felt that an examination could be conducted without any great difficulty. By the end of the four hours she was still in—she progressively improved during the four hours, rather than getting worse, so that by the end of that time she was quite capable and competent, had regained her sense of humor, and I thought was in adequately good health.

"Q Doctor, from your observation of Miss Loughran during the examination, would you describe to the court her alertness, her level of alertness?

"A I felt her level of alertness was quite adequate. There was nothing specifically deficient in it. She answered every question. She understood what was going on. At one point she threw Kleenex around the room, but quickly apologized, picked up the big pieces and put them in the wastebasket. I felt her awareness was not impaired.

"Q In your view, Doctor, in your judgment, was Miss Loughran responsive to questioning on your part?

"A Yes, she was. Although certain questions would tend to upset her more than others.

"Q When you say that certain questions would tend to upset her more than others, would you state what particular area of questioning seemed to upset her?

"A I think the main area was asking her to discuss her marital relationships subsequent to her divorce.

"Q Doctor, were there any areas in which Miss Loughran claimed a loss of memory?

"A No, there were not.

"Q Have you formed an opinion as to whether the proceedings before the federal grand jury would be temporarily injurious to Miss Loughran's physical or mental health?

"A Yes, I have an opinion.

"Q What is that opinion?

"A I feel that there would be some temporary injury to her physical and mental health.

"Q When you say 'temporary injury,' would you describe to the court what you mean by temporary injury?

"A First in regard to physical health, I feel that her ordeal is taxing and she would tend to lose sleep. I feel that her appetite would be quite affected. She would be quite nervous and would probably perspire more than normal.

"In general, she would have the physical reactions that one would expect in a stressful situation.

"Q Doctor, other than the symptoms that you have described of what one might expect of an individual who was under stress, and that which you have described to the court, are there any other physical factors which you believe, or physical experiences, which you believe Miss Loughran would experience as a result of testifying?

"A If by 'physical' you mean caused by organic change to the body, no.

"Q Would you state whether or not her mental health would temporarily be impaired or injured in any manner?

"A Yes, I feel there would be or could be some injury to her mental health on a temporary basis.

"Q Once again, when you say 'injury,' in this area of mental health, Doctor, would you describe for the court what you mean by that?

"A All I can think of in terms of injury would be that she might develop hysterical symptoms.

"Q What do you mean by 'hysterical symptoms'?

"A Hysterical symptoms are psychological symptoms that result from a conflict within the individual. They can take many forms, from all kinds of pains to trouble with seeing; it could affect practically any part of the body.

"Q Doctor, do you believe that Miss Loughran's testimony before the federal grand jury would be injurious, either physically or mentally, to her in a permanent sense, that is, in the long run?

"A No, I don't believe these things would cause any permanent injury.

"Q Doctor, in your report that has been submitted to the court, you discuss conflict, and you use the term 'conversion symptoms'; would you describe to the court what you mean by the conversion symptoms as it applies to Miss Loughran?

"A 'Conversion' means a change. It is a change from some emotional problem into some physical sign. For example whatever the deep conflict might be, it might manifest itself, say, in blindness or something. There would be a transfer. The problem is converted into the physical. Usually that reduces the level of anxiety. Because once a person has a symptom, he can henceforth worry more about the symptom and not about what it was that is really bothering the individual on a deeper level.

"Q Doctor, you have also used the term 'secondary gain elements'; would you describe that term to the court?

"A Yes. A symptom has sort of— the primary purpose of the symptom is sort of a compromise between the person's conflict. Secondary gain refers to what else that symptom can accomplish for the individual. For example, perhaps a physical illness, which has hysterical qualities to it, might result in a pension for the individual; or a soldier who breaks down in combat, the secondary gain—his original breakdown would be because of all kinds of pressure, the second would be that he would avoid returning to combat. This would be sort of a bonus. In hysterical symptoms, secondary symptoms is a way—not a way, but is a procedure where the person can avoid distressful situations.

"Q Doctor, with reference to your examination of Miss Loughran, would you describe how conversion symptoms and secondary gain elements apply to her case?

"A I think that she has great ambivalence—'ambivalence' means mixed emotions—about testifying. Part of her does not want to testify, and perhaps part would like to cooperate or is being forced to cooperate. This causes a conflict. The conflict winds up being converted into some symptom. Now, the symptom, as I say, is the result of the conflict. The secondary gain features are, if the symptom is severe enough, it will get her out of this undesirable situation.

"Q Doctor, has your examination revealed any propensity towards violence, or suicidal tendencies on the part of Natalie Loughran?

"A No, it did not.

"Q You did, however, mention in your report the term 'suicidal gestures,' as it applies to Miss Loughran. Would you go into that for us, please?

"A Yes. People who are depressed and who think of committing suicide, one word to characterize that might be the suicidal ideation, or thinking of committing suicide. These individuals are in very grave situation and may go ahead and commit suicide.

"Many of the people who eventually commit suicide do so in pretty much of a forthright manner, rather than a suicidal gesture.

"Suicidal gesture is more designed to demonstrate to everyone around that the person is in great conflict, is in great distress. The suicidal gesture is not designed to commit suicide. It usually will involve something quite dramatic. And as a rule the person escapes most injuries. Occasionally there will be a minor injury. It is quite rare for the person who makes suicidal gestures to commit suicide. It does occur sometimes by miscalculation; where you had expected to be rescued at the last minute and the rescuer didn't show up on time. That, of course, can lead to a disaster. But as a rule suicidal gestures are not particularly serious.

"Q During the course of the interview with Miss Loughran, did she relate to you any experience which you would characterize as a suicidal gesture, as opposed to a suicidal tendency?

"A Yes. She mentioned at least two that I recall.

"Q Would you describe those, sir, or state in substance what she said to you during your examination?

"A She described one event, which occurred, I believe, about a year ago, and I don't know the—she didn't tell me about the circumstances, she did mention that she had cut one wrist twice. I asked her if this was deep enough to have cut the tendons. She stated no.

"Again, this to me is more of a suicidal gesture and quite frequently seen in hysterical situations. Also very frequently seen in temporary depressions, when, say, someone is apprehended and while he is awaiting trial he may cut his wrist in prison, in jail. I have seen this many times.

"The other event she mentioned, and her attorney mentioned it to me also, occurred I believe Thursday night when it was alleged that she jumped out of a moving car in front of, I believe, the Beverly Wilshire Hotel, and ran down the middle of Wilshire Boulevard.

"I asked her about injuries, and she stated that she hadn't even received a minor injury from this occurrence.

"Q With reference to these two incidents, it is your professional judgment that these were two suicidal gestures as opposed to suicidal tendencies, is that your testimony, Doctor?

"A Yes, sir.

"MR. MILLER: Your Honor, the government has no further questions at this time.

"THE COURT: What about the report? Are you going to introduce that?

"MR. MILLER: The government would request that the report be filed as an exhibit, and that the report, together with Dr. Marcus' testimony be

considered by the court in making its determination.

"THE COURT: Any objection?

"MR. BUSBY: No objection, your Honor.

"THE COURT: Marked in evidence as Government's Exhibit 1. That is, the report.

"(The exhibit was received in evidence and marked as Government's Exhibit No. 1.)

"THE COURT: All right. Cross examine.

"MR. BUSBY: Thank you very much, your Honor.

"THE COURT: By the way, for the record I had better note that Exhibit 1 is Dr. Marcus' report dated December 19, 1966.

"That is your report, is it, Doctor?

"THE WITNESS: Yes, sir.

"THE COURT: All right.

"CROSS EXAMINATION
"BY MR. BUSBY:

"Q Dr. Marcus, you have stated in response to Mr. Miller's question that you have testified previously. Could you please tell us on how many occasions?

"A I would say between 15 and 20.

"Q On each one of those occasions, sir, had you been appointed to examine a person?

"A Not all.

"Q As to the 50, how many were appointed, please?

"A I thought it was 20.

"Q I misunderstood you. I thought you said you had testified on 50 occasions.

"A I am sorry. 15 to 20.

"Q Of the 15 occasions, how many were you appointed?

"A I would say about half. Most of the court appointments have resulted in a report being submitted to the court without any necessity of appearing in person.

"Q On those occasions, sir, were you appointed by the federal district court?

"A No.

"Q In about how many of the times you were appointed were you in fact appointed by the federal district court?

"A Of the times that I was in court to testify?

"Q Yes.

"A This is the first.

"Q Doctor, the psychological reports and examinations which were given, do you have a copy or copies of them with you, or the originals, sir?

"A Of the psychological report—

"Q Yes, the thematic apperception test.

"A No, I don't have the copies of that report.

"Q Do you have the results and/or examination of any of the reports, including starting with—you mentioned Rorschach, thematic apperception, Wechsler, Minnesota—do you have any of these available, sir?

"A All those were reported in one composite report that was done at my request by a psychologist. I abstracted out of that what I thought was pertinent and placed it in my report.

"Q Do you have the one composite report from which you gleaned what you considered to be the pertinent information with you, sir?

"A No, I don't.

"Q Doctor, you have had an opportunity this morning, have you not, sir, to have a conversation with Dr. Frederick Hacker?

"A Yes, I have.

"Q And previous to your conversation with Dr. Frederick Hacker, you have known of Dr. Frederick Hacker's work, have you not?

"A Yes.

"Q Taking into consideration your report, Dr. Marcus, for a moment, please, you have stated within the confines of your report that you consider Miss Loughran to be erratic and unpredictable. By that would you please explain the words 'erratic and unpredictable' to the court, please?

"THE COURT: You are referring to Exhibit 1, are you, Mr. Busby?

"MR. BUSBY: My apologies to you, sir.

"Q Referring to your report heretofore marked People's Exhibit 1.

"A Yes. That was—

"Q On page 2, paragraph 3, sir.

"A Yes. That was abstracted from the psychological testing. What was meant by that is that her personality is such that she is not very consistent in her endeavors, neither in her endeavors nor in her emotional reactions. It is hard for her to carry on anything consistently in a reliable manner.

"Q In addition to that, sir, and taking that into consideration, you have stated, have you not, that she does, in fact, have underlying emotional conflict; is that not true?

"A Yes.

"Q And she also has—in your opinion she does, in fact, have unconscious conflict; is that not correct, sir?

"A That's correct.

"Q Now, an unconscious conflict is the same, is it not, sir, as an involuntary act; in other words, she does not consciously produce the conflict, but in fact the conflict is produced upon her mind, therefore manifested in her person, that is, her physical person, by whatever the stresses and strains are which are brought to bear upon her person; isn't that correct, Dr. Marcus?

"A Yes.

"Q Dr. Marcus, your demeanor on the stand presently, your quietspokenness, your apparent kindness, was that the same manner that you used in the interview of Miss Loughran?

"A More so, perhaps—

"Q In other words—

"A Excuse me.

"Q Excuse me. Go ahead, please.

"A Would you repeat that question?

"Q I will be glad to.

"Read it to him, please.

"(Question read by the reporter.)

"THE WITNESS: Essentially, yes.

"BY MR. BUSBY:

"Q So that if you were kindly towards her would that not be, in effect, overcoming her apparent apprehension initially, and because you were a kind person and presented yourself in that manner, would that confidence that you allowed her to have in you cause her to be calm?

"A Yes, it would certainly help.

"Q You did not think at all that the initial confrontation of her being upset was in anything or in any way but genuine, did you, sir?

"A I thought it was essentially genuine apprehension about seeing a psychiatrist.

"Q At the time when you first saw her, I believe you said she was in tears— maybe that is incorrect—on the verge of tears, I believe you said. Is that true, Doctor?

"A Not exactly. I believe I said that as we were talking she cried at various points.

"Q If one was capable of gaining Miss Loughran's confidence, and that person now having that confidence, it would be normal that the apprehension would leave and the sense of humor or her normal reaction to what is considered to be a friendly face would, in fact, take place; isn't that correct, sir?

"A Not necessarily. It might be normal, but the people I see in the office are usually not normal. The people that calm—it is characteristic of hysterical patients to calm down quite quickly. I see many other patients who, not only don't they calm down but may get worse during the interview.

"Q An hysterical person—and you do agree that Miss Loughran is an hysterical person, do you not, sir; there is no disagreement there, is there?

"A No disagreement.

"Q Now, a person who is termed an hysterical person, even though they may or may not know a fact or circumstance perceived by their sense, because of their hysterical emotional state, that would in effect inhibit their ability to relate, would it not?

"A Yes.

"Q So if, in fact, at a time, hypothetically, if Miss Loughran saw a blue object, and was in fact hysterical, emotionally upset, under a strain, and was asked whether or not, in fact, she had seen the blue object, she would then not necessarily be able to relate, genuinely relate, the fact that it was in fact a blue object; is that not true, sir?

"A That's correct.

"Q Dr. Marcus, directing your attention, sir, now to the physical and mental health of Miss Loughran, I would like to direct your attention, sir, to the fact that I believe you responded to a question of Mr. Miller to the effect that the physical manifestations of an emotional conflict would be manifested in two ways, basically, that being here what you have termed her lack of sleep, and possibly not eating. Would this also, that is, this physical manifestation, also cause in Miss Loughran to manifest itself in other areas? For instance, would it also cause her other problems, such as cosmetic problems; in other words, would blemishes also appear on her face, and also would problems as to her perceptive abilities also take place? For instance, any underlying growths, et cetera, could form about the eyes or the nose? Would they manifest themselves in that way?

"MR. MILLER: Excuse me. Objection. Are you asking the doctor whether that is a possibility, or whether it is applied to this specific case?

"MR. BUSBY: That is a foundational question for the next question as to whether or not he did, in fact, perceive any type of bumps, growths, et cetera, upon the face of Miss Loughran.

"THE COURT: You may answer. Overruled.

"THE WITNESS: Should I answer the second question that you proposed to Mr. Miller, or the first one to me?

"MR. BUSBY: There are two questions propounded to you, sir. I should say there is one propounded to you.

"THE WITNESS: The first one is 'Yes.'

"BY MR. BUSBY:

"Q Did you during your examination notice whether or not any, in fact, had taken place, that is, any type of growths, blemishes, et cetera, any protrusions upon the face of Miss Loughran?

"A Not that I was aware of. She didn't remove her sunglasses, so I couldn't tell about that part of her face. But the rest, I wasn't aware of anything.

"Q Very well, sir.

"Doctor, you said as to other, you found that there was no organic change; is that correct?

"A I don't recall those words in my report. Would you point out where I made that statement?

"Q Let me do it another way. Mr. Miller asked you a question, sir, whether or not you noticed or whether or not there was any other physical temporary or permanent injury to her, to which you stated, in response to the question, that there was no organic change or would cause no organic change. Do you recall that, sir?

"A Yes, I believe I stated that I didn't feel that she would sustain any permanent organic change.

"Q When you said there would be no permanent organic change, did you also insinuate in your answer that there would, in fact, be other physical change, other than organic?

"A I believe—I thought I had made it clear that I felt—or maybe I didn't—that there would be no permanent psychological damage, as well. And then I went into my feelings about temporary psychological injurious effects.

"Q Doctor, the emotional conflict and her underlying emotional problems are problems which you have stated cause her to act in an involuntary manner. Would you also say that the secondary gains are secondary involuntary gains, sir?

"A I would say they are partly involuntary, partly voluntary. When one tries to assess how much of a person's behavior is voluntary versus how much is involuntary, it becomes extremely difficult. Particularly in hysterical situations, and most specifically in situations of some very great stress to the individual.

"This is like attempting to have the psychiatrist state whether the person is malingering, which implies voluntary versus hysterical, which implies involuntary.

"Human behavior being as complex as it is, there is usually a little of each. But how much of each is very, very difficult to find out.

"Q Well, you believe as to Miss Loughran, as far as she is concerned, as to her, that her present situation, her appearance in questioning before the grand jury, is a great stress in her case, do you not, sir?

"A Yes, it is a great stress.

"Q And because of this great stress upon her particular person, this particular person is brought into an hysterical state, which after being involved in the hysterical state it becomes difficult for her to subsequently voluntarily control herself; is that not true, sir?

"A Yes. I think perhaps this might be best illustrated by an analogy. The analogy is as follows: If her condition, her involuntary condition would be, say, a small fire that is started involuntarily, a person may add fuel to the fire voluntarily. If the fire gets sufficiently large, it becomes beyond control of the person who perhaps started the fire in the first place. So how much fuel she is adding to her fire, I don't know, but once she has added enough, or enough has been added, of course she can't control herself.

"Another way of looking at it is in a small child, when a small child cries, if

you come in and stop—grant the child's wishes, the child sometimes can't stop crying after that, the child will continue to sob, because it becomes involuntary.

"Q. One final question, Doctor. Also would you not then say that her condition, her hysterical state, would also cause her a problem to communicate the relevant materials, isn't that correct, sir, that would go hand in hand, would it not?

"A It might and it might not. It depends upon what the symptom is. If her hysterical symptoms take the form of being unable to talk, she would have, obviously, great difficulty. If her hysterical symptoms involve paralysis of her foot, it might have no effect upon her ability to communicate.

"MR. BUSBY: Thank you very much, Doctor. I have nothing further.

"THE COURT: All right. Redirect?

"MR. MILLER: Yes, sir.

"REDIRECT EXAMINATION
"BY MR. MILLER:

"Q Doctor, on cross examination you were asked about the description 'erratic and unpredictable'; is that correct, sir?

"A Yes.

"Q You have applied, or your report indicates that there are certain other descriptions of Miss Loughran, which you believe to be so, as far as her personality is concerned, as expressed on page 2 of Exhibit 1, is that correct?

"A Yes.

"Q With respect to all of these terms which are used, were these terms as a result of the clinical psychological evaluation that was made?

"A These were the results of psychological testing.

"Q And then embodied in your report, is that correct?

"A Yes.

"Q Now, I ask you this question, sir: With respect to all of these terms, including 'unpredictable and erratic,' would these personality characteristics necessarily render one unable to appreciate the consequences of an oath taken before a grand jury?

"A No. None of these traits, together or singly, may have a deleterious effect upon that. In fact, even psychotic conditions haven't precluded someone from testifying, nor has the fact of someone being, perhaps, a very young child, who may testify quite capably.

"Q Very well, sir. Likewise, with respect to the capacity to testify, as to what one has either seen or heard in the past, would these characteristics which you set forth on page 2 of Exhibit 1 necessarily affect that ability?

"A Not necessarily.

"Q Now, Doctor, on cross examination you mentioned an analogy, that is, that a fire might be started and then the fire might be continued along and perhaps made more warm and more brilliant by one's own doing; and you apply this, I take it, to an hysterical state, is that correct?

"A That is correct.

"Q And applying this situation to Miss Loughran, would it be a fair statement to say that once she was experiencing a mild discomfort and mild hysteria, and upset, if she began to think about something that she did not want to do, something that was unpleasant to her, would this be the type of feeding of the fire that you have spoken of on cross examination?

"A Yes.

"Q You have mentioned that Miss Loughran was in tears; is that correct?

"A Yes, at one time.

"Q During the beginning of the interview?

"A Yes.

"Q From your experience, even in an individual who is normal, if I might use that term, or not suffering from any serious mental or physical defect or disease, it is not unusual, is it, for someone to have tears, to be crying, if they are upset by reason of the fact that they are being forced to do something which is extremely unpleasant to them?

"A That is not unusual.

"Q Likewise, it might be a fair statement to say that any individual who is compelled to do something which is unpleasant, something which he doesn't want to do, something which he feels strongly about for one reason or another, would experience what you have said is stress; is that correct?

"A Yes.

"Q And stress manifests itself in any number of ways, is that correct?

"A Yes.

"Q In the situation of Miss Loughran, you say that she became what appeared to you to be hysterical and upset; is that right?

"A Yes.

"Q You have stated that as far as you are concerned from your analysis, from your examination of her, you find no serious mental disease or defect?

"A I don't believe I stated that in the report. Not with that connotation.

"Q I will ask you now, sir, do you find a serious disease or defect in Miss Loughran?

"A Yes, I do.

"Q And what is that, sir?

"A She has a defect in terms of her formation of her personality. She has what is called a sociopathic personality. This is getting off into a rather technical area. She is not what you might call the average, normal, healthy, contented human being, at best. She would deviate from the normal. Not that she would necessarily have symptoms, but that her life has not been a well organized, fruitful venture for her. It has been crises and, rather, disappointment.

"Q Doctor, with reference to the term 'sociopathic personality,' using more basic language, is that associated with what we call an anti-social personality?

"A In general, yes.

"Q I will ask you, sir, whether this condition which you have described, if it exists in Miss Loughran, would affect her ability, No. 1, to appreciate the consequences of an oath; and, secondly, to testify as to what she has seen or heard in the past?

"A No. The answer is no, there is no correlation between any mental disease and the ability to do anything in the legal sense, whether it be responsibility, credibility, or the ability to testify, or whatever. One cannot translate from one to the other area.

"Q Doctor, with reference to any injury, just to clarify it, I believe your testimony was to the effect that there would be no permanent injury in your judgment; is that correct?

"A That is correct.

"Q And that the physical injury, if any, would be in regard to a loss of sleep, perhaps a decrease in appetite, increased perspiration; is that correct?

"A That is correct.

"Q What one might say would be the experience of an individual who is under stress; is that correct?

"A That's correct.

"Q You were asked whether or not Miss Loughran's condition could have some cosmetic effect. Would you indicate what your opinion is as far as that is concerned?

"A Yes. It is possible one type of a stress reaction involves the skin, and it could involve such things as blanching or hives. Various types of skin diseases are considered to be either psychosomatic or perhaps even—just pure reactions to stress.

"Q With regard to Miss Loughran, you say that you did not note any cosmetic problem; is that correct?

"A That's correct.

"Q Did she complain of any?

"A She said that years ago she used to have sort of an itchy, burny scalp and had quite a lot of trouble with it. She didn't state that anything of that nature was bothering her currently.

"Q If a cosmetic problem was a problem of Miss Loughran, that may, but would not necessarily be a result of her current upset; is that correct?

"A That's correct.

"Q But you noted none?

"A That's correct. I really didn't examine her scalp or go into any sort of a physical examination.

"Q A scalp problem as she described, that wouldn't be an uncommon situation with reference to a person who might be normal, would it, who might just be nervous, let us say? Do you find, for instance, or have you run across situations where people who are nervous, excessively nervous, have either scalp or skin problems?

"A That's true.

"Q That isn't too unusual, is it?

"A No.

"MR. MILLER: No further questions.

"MR. BUSBY: I have nothing further, your Honor. Thank you.

"THE COURT: Any further evidence?

"You may step down, Doctor.

"Any further evidence to be presented by the government?

"MR. MILLER: The government has no further evidence." [26]

At this point the Court inquired whether counsel for Miss Loughran desired to present any evidence and they responded in the affirmative:

"THE COURT: Do the attorneys on behalf of Miss Loughran desire to present any evidence?

"MR. BUSBY: Yes, your Honor, we do.

"THE COURT: All right.

"MR. BUSBY: Thank you.

"May it please the court, we will call Dr. Frederick Hacker to the stand, please.

"DR FREDERICK HACKER called as a witness by and on behalf of Natalie Loughran (Lockwood), having been first duly sworn, was examined and testified as follows:

"THE CLERK: Please be seated.

"State your full name for the record.

"THE WITNESS: Frederick Hacker, H-a-c-k-e-r.

"DIRECT EXAMINATION

"BY MR. BUSBY:

"Q Dr. Hacker, would you state to the court, please, your profession?

"A I am a licensed physician and surgeon in the State of California, specializing in the field of neuro-psychiatry.

"Q How long have you pursued your profession, sir?

"A Well, I have been in the practice of psychiatry for 27 years now, practicing in California for about 23.

"Q Are your offices located in Los Angeles County, sir?

"A Yes, they are. I am the acting head of an organization known as the Hacker Clinic, which now comprises 25 professional staff members, and that has offices in Beverly Hills, California, and in Lynwood, California.

"Q Doctor, do you have any training in the psychiatric field?

"A Some.

"Q Would you please be kind enough to relate that to the court?

"A Yes. Do you want the whole medical background, too?

"Q I would like to have you relate to the court your training that could possibly lead the court to believe that you are qualified to give your opinion in the field of psychiatry, yes, sir.

"A Well, I went to medical school at the University of Vienna; then graduated at the University of Basel, Switzerland, with an M.D. degree; then had post-graduate training in Switzerland and in London, England; then had a rotating internship at the St. Francis Hospital in Jersey City, New Jersey; then a residency at the New York State Psychiatric Institute. At that time I became an assistant instructor at Columbia University in New York City; then was at Manhattan State Hospital in New York as a staff member; then was a resident, and ultimately a staff member of the Menninger Clinic in Topeka, Kan-

26. Rep.Tr. Dec. 20, 1966, p. 4, line 21—p. 39, line 17, incl.

sas; and then came to California and started in private practice, and now am running these two clinics, also being an Associate Chief of Service of the Psychiatric Unit of St. Francis Hospital in Lynwood, California. I am a Diplomate of the Medical Board of National Examiners. I am a Diplomate of the Specialty Board in Neurology and Psychiatry. I am a full clinical professor of psychiatry at the University of Southern California, particularly also concerned with the teaching of law and psychiatry. I am clinical professor at the University of Kansas Medical School, and belong to the faculty of the Menninger School of Psychiatry, aside from being a guest professor at the University of Vienna in Austria. I have been on the panel of court experts for the Superior Court of Los Angeles for the last 19 years, and have testified in numerous—in several hundred cases. I am a Fellow of the American Psychiatric Association, a Fellow of the American Medical Association, a founding member of the Los Angeles Psychoanalytical Association, a member of the American Psychoanalytical Association. I belong to about a dozen more such national and international organizations. I think, also, to about three or four law-psychiatry organizations, which we believe we started in California about 20 years ago in the framework of our foundation and clinic.

"MR. BUSBY: Counsel at this time would respectfully submit to the court that Dr. Frederick Hacker is qualified to testify as an expert in the field of psychiatry.

"THE COURT: Yes, I agree. I so find.

"MR. BUSBY: Thank you very much.

"Q Dr. Hacker, directing your attention to Miss Loughran, at my request did you receive a visit from Miss Loughran?

"A I did so.

"Q On what date was that, please?

"A Yesterday. That is December 19, 1966.

"Q Where did that appointment take place, please?

"A Well, I was at that time, when you called, at my Lynwood office, or at the hospital, and I made the appointment for her at my Lynwood office.

"Q At the time when she arrived at your office, was she accompanied by someone?

"A Yes, sir, she was accompanied by a gentleman who presented himself as her brother-in-law.

"Q At the time that she presented herself at your office, did you at that time conduct an examination of Miss Loughran?

"A I did.

"Q Would you please be kind enough to relate to the court what took place between you and Miss Loughran as to your examination?

"A Well, I interviewed her, and at first it was only a very cursory examination. She was at that time in a state of high excitement, being practically hysterical, in tears, panicky, and utterly distraught, being somewhat incoherent, obviously as the result of anxiety, making all kinds of threats in regard to her self-destruction; therefore I advised, in order to have her calm down and to give us a chance to observe her, that she be immediately hospitalized, which was a suggestion that I communicated to you and communicated to the brother-in-law, aside from the patient herself. And after some hesitation she accepted that, and we forthwith hospitalized her at the closed psychiatric ward of St. Francis Hospital in Lynwood, California, where she has been since yesterday afternoon.

"Q After that encounter, did you have an opportunity to see her at a later time?

"A Yes. After admission to the hospital she was examined by one of our staff psychiatrists, Dr. Braverman, and I spent another two and a half hours with her talking to her rather intensively.

"Q Did Dr. Braverman perform any type of an examination?

"A Yes, he did perform a psychiatric examination, and I have his written—his handwritten report here.

"Q Would you please be kind enough to relate to the court what type of examination was done, please?

"A Well, Dr. Braverman apparently performed a conventional psychiatric—what we call intake interview with Miss Loughran. And I then talked to her in psychiatric interviews for a couple of hours. Also, incidentally, I had an opportunity to talk a little bit to her sister who came to visit, and to her brother-in-law who had originally accompanied her.

"Q As a result of that particular examination, and at a later time, specifically this morning in the Federal Building, did you have an opportunity to read in my presence the report submitted by Dr. Eric Marcus?

"A I did, sir.

"Q And in addition to reading that report were you given an opportunity to converse with Dr. Marcus?

"A Yes, I had such an opportunity and conversed with him for about 15 minutes.

"Q In addition to that were you present in court this morning when Dr. Marcus testified on direct examination, cross examination, and redirect examination, by Mr. Miller and myself?

"A Yes, sir.

"Q Now, specifically, Doctor, would you be kind enough to relate to the court in what areas, if there are any areas, in which you disagree, and give the reasons, with the testimony of Dr. Marcus?

"A Insofar as I had only a very short opportunity to look at his report, could I request that I be given a copy of it?

"THE COURT: Here you are, Doctor. Exhibit 1.

"THE WITNESS: Now, would you be good enough to repeat the question?

"BY MR. BUSBY:

"Q I will be glad to, sir.

"As a result of your examination, your conversation with Dr. Marcus, hearing his testimony, and reading his report, would you be kind enough to relate to the court in what areas, assuming there are any areas, that you disagree with Dr. Marcus?

"A If I may turn it around and first say with what I do agree because there are wide areas of agreement.

"I think I agree with all of his observations, at least in that sense that the patient's behavior to me was not inconsistent with the kind of behavior that she displayed to Dr. Marcus on his examination.

"I also would agree that there is no evidence of any more serious symptoms of mental illness, such as delusions, hallucinations, or paranoid ideas. In other words, I fully agree that the patient is not mentally ill in the sense of being psychotic, legally or medically mentally ill.

"However, I also agree with what I think the report describes, which are high dramatic and intense stress reaction, anxiety, fear, panic reaction—

"MR. MILLER: Excuse me.

"Might I ask if you used the term 'dramatic'? Is that what you said? I am sorry I didn't understand.

"THE WITNESS: Yes.

"MR. MILLER: Thank you.

"THE WITNESS: I think I read that from what Dr. Marcus said.

"(Continuing)—and find—and this is maybe in contrast with a different emphasis from Dr. Marcus—that her state of excitement at the moment is so intense and so great that—to leave the psychiatric jargon for the moment—she really doesn't know what she is saying or doing. She is irrational at the moment, and in danger of self-destructive or other irrational actions, that she abundantly threatens.

"Again, not in disagreement, but different emphasis from Dr. Marcus, I would like to point out what she had in her history in the past, unrelated to any proceedings against her, or proceedings in which she participates, there is a history of a suicidal attempt, there is another threat of suicidal attempt; and according to all the newer examinations.

that were conducted into the nature of suicide, particularly here in Los Angeles the professional concensus is that most successful suicides have been the result of suicidal gestures that have miscarried. So without going into the question of how serious—how one can distinguish between gesture and intention, it is a matter of statistical fact that most actual suicides that are performed are the result of gestures that have miscarried. And insofar as Miss Loughran was, when I saw her, in a totally uncontrollable and uncontrolled state of anxiety and panic, I felt that the danger of suicidal or other irrational action was clear and imminent and something had to be done about that, and that is why I suggested hospitalization. And I believe this state of affairs still persists, despite the fact that there is no evidence of mental illness in the conventional sense of the word.

"Q Doctor, do you feel in Miss Loughran's present state that she could give a correct account of retrospective activities as perceived by her senses?

"A Well, I think she does, to stay with the definition, she does appreciate the significance of an oath, and just because of that she is internally in such turmoil and so upset and so distraught —at the moment—that I believe that just because she appreciates what her obligation is, she is probably at the moment blocked and prevented from accurately relating what actually happened and what she saw and observed. I think at the moment she is incapable of doing so.

"Q In that light, Doctor, and on the same subject, taking into consideration your examination, what you have perceived, and Dr. Marcus' examination and your conversations with him, do you feel as though further psychiatric treatment could be effective in causing Miss Loughran to correctly account retrospective activities?

"A I do indeed believe so. I think that psychiatric treatment for her condition is immediately indicated, and I believe the prognosis, insofar as there is no severe mental illness present, I believe the prognosis is good so that one can expect with some calming down within a relatively short period of time she may very well be able to then accurately relate and recollect what happened.

"Q You say a relatively short time; would you be able professionally to estimate and define what the words 'relatively short time' mean to you, sir?

"A Maybe to psychiatrists they have different evaluations. What I meant was a question of three to four weeks.

"Q. Dr. Hacker, you were present when Dr. Marcus gave his analogy, and, if you will, sir, as to the feeding of the fire, as to voluntary and invountary; did you hear that?

"A Yes, I did.

"Q Do you agree or disagree with his analogy, sir?

"A Well, I agree with him that the distinction between voluntary and involuntary is extremely hard to make. I think he said that neurotic conditions and hysterical conditions are on the basis originally of unconscious conflicts, but—if I understand his analogy correctly—then fanned by expectation of gain, by expectation of escaping responsibilities, and so on; so that originally on the basis of unconscious, involuntary, unplanned-for situations, there may be a fanning of the fire, as he put it, by voluntary participation. And I would basically agree with that analogy. I would, I think, refine it a liitle bit or add to it by saying that there is this— there is a tinder underbrush, there is a whole development in the history— the whole development of the patient indicates that any kind of severe excitement might set her off and set her off in such a manner that she tends to then become irrational and at least dangerous to herself. There are many incidents in the history, apparently, that had that kind of effect, and that in turn point to the underlying, unconscious, neurotic disturbance. All of that tends, I believe, to indicate that the fire that is fanned right now, according to Dr. Marcus, can really get out of control and can even lead to self destruction

action, which may have been an unplanned and unintended suicidal gesture, which however leads to suicide.

"Q Doctor, do you have an opinion as to whether or not Miss Loughran's further appearance and questioning before the grand jury would be temporarily or permanently injurious to her mental or physical health?

"A Well, I believe that it could easily be injurious to her temporary mental health, certainly, but I could, also, easily understand that there may be consideration overriding such things. I, however, feel as a doctor and as her physician, which I was now appointed, that in several weeks the situation may not be the same any more, and that then the damage to her could, comparatively speaking, be minimized, as compared to right now. Maybe it cannot be completely avoided or evaded, but it can certainly be minimized as compared to right now.

"Q Would a fair estimate be, then, in answer to the question, that you do believe that there would be temporary mental damage as far as Miss Loughran is concerned?

"A That is correct. Temporary mental damage that in the brush fire example may get out of hand and thus become permanent.

"Q At a later date, subject to psychiatric treatment, assuming that there would be at a later date any damage at all, it would be minimal, as opposed to its present possibility; is that correct, sir?

"A I think there is a good expectation that the damage then done would be considerably less than it would be at the moment.

"Q Doctor, do you have an opinion, in response to the same question, as to whether or not there would be any physical—that is, temporary or permanent physical harm done presently, if her appearance and questioning before the grand jury were to continue?

"A I do have a guess, not really an opinion, because I want you to bear in mind that I haven't had an opportunity to examine her thoroughly, and one of the reasons I suggest her continued hospitalization is to give us the opportunity of a fuller examination. But I know from the history that she gives that she was under the treatment of an internist a couple of years ago; aside from being under the treament of a psychiatrist or psychologist, she was under the treatment of an internist for an internal condition of her colon that was, I think, diagnosed and is usually regarded as a psychosomatic condition, so that it stands to reason to at least suspect that emotional strain may cause physical reactions of one sort or another.

"Q Do you recall the medical term for that, Doctor?

"A I believe the diagnosis was given either as megacolon or ulcerative colitis. But we haven't had an opportunity yet to check that with the doctor, though we have his name.

"MR. BUSBY: I have nothing further, your Honor. Thank you.

"THE COURT: Cross examine.

"CROSS EXAMINATION
"BY MR. MILLER:

"Q Dr. Hacker, when did you first see Miss Loughran?

"A Yesterday.

"Q Who brought her in to you?

"A Her brother-in-law.

"Q At that time, sir, what information was given to you with reference to the situation that Miss Loughran was facing before the federal grand jury?

"A Well, again, I cannot completely distinguish at what time during the afternoon the various items of information reached me.

"Q I am sorry, sir. What I want you to relate is during the afternoon or yesterday what information was related to you with reference to what Miss Loughran was facing or what the circumstances of her appearance before the grand jury were.

"A Well, I was made aware by Mr. Busby, mostly, and by the patient, about

the main features of the proceedings. Do you want me to say what my understanding of them is?

"Q Yes. What were you told, what knowledge did you have?

"A I was told that Miss Loughran was appearing and had been appearing for several days as a witness at the federal grand jury; that she had become increasingly upset; that she had, I think, at first used—pleading the self-incrimination amendment, she had then been granted immunity by the United States Attorney's office and was now testifying under immunity, so that as she understood it, there could not be any criminal prosecution as a result of what she was saying; that this proved an increasing stress to her that made her totally upset and panicky and distraught and depressed, and as she claimed, irrational, and that she could not face returning to that; that she did not care what happened, and so on and so forth. That is a separate question. But I knew she was and had been a witness at the federal grand jury and had been granted immunity, and that she was ordered back to court today, therefore I represented to Mr. Busby and to the patient, before admitting her to the hospital, that I would admit her only under the condition that she voluntarily consented to be present in court this morning.

"Q It was not her desire to appear here this morning?

"A I don't know what her desire was. I stated that as one of the conditions of my admitting her to the hospital.

"Q Did she express a desire to you with reference to her returning to court this morning?

"A She expressed a number of—she made a number of statements that I would call irrational in that context in which, also, the return to court played a role, yes, sir.

"Q When you say she made some irrational statements, please state what those statements were, sir.

"A She said, 'I wish I could get out of this whole thing. I am going to kill myself. I don't care what happens. I don't mind. I am going to fly some place. Let me out of here. I cannot stand it any more.' And statements of that nature.

"Q Did she discuss with you the nature of the questions that she was being asked?

"A Just very vaguely. I mean she indicated only that these were personal questions that she found extremely hard to answer and that, therefore, several factual questions she tried to answer but was really unable to recollect, because at the moment she is in such an emotionally confused and anxious state that, as she called it, she doesn't even know her own name.

"Q Doctor, did she relate to you the nature of this investigation before the grand jury?

"A The nature is, I think, in some alleged activities of some form, of friends of hers, in gambling or something.

"Q Did she tell you that the grand jury was investigating possible violations of interstate transmission of wagering information and interstate transportation in aid of racketeering?

"A She was not specifically saying that. She said gambling things. But I would think that that is assumed under that, isn't it?

"Q Did she state to you that she was being questioned about some of her friends with reference to this particular investigation?

"A Yes, sir.

"Q And you knew that, is that correct, sir?

"A Yes, sir.

"Q Did you know or were you told by her or anyone else that having been granted immunity by the court, that when she first appeared before the grand jury thereafter she was relatively calm?

"A No, I did not know anything about the details of her vacillations, if any, under testimony.

"Q I take it, likewise, you had not been told that as the questioning continued that her reactions were more in line with what you have described as perhaps hysterical; you were not aware of that?

"A Oh, yes, she told me that she became increasingly more upset as the questioning went on; so to that extent I knew it.

"Q Did she tell you what the questioning was when she became upset in the grand jury room?

"A Only in that general way.

"Q Where did you examine Miss Loughran, Doctor?

"A At first in our office at 3621 East Century Boulevard, Lynwood, California; and then at the psychiatric ward of the St. Francis Hospital in Lynwood.

"Q How long did these examinations take?

"A Well, I would say about a total over three hours.

"THE COURT: Just one second.

"Is your examination going to be rather extensive?

"MR. MILLER: Your Honor, I would say another 15 or 20 minutes.

"THE COURT: We have problems here. I have a petit jury waiting around and I understand there may not be a need for them. I don't want them to have to sit here.

"MR. MILLER: I will try to be brief.

"THE COURT: We should take a noon break somewhere along here.

"Is there any other evidence to be submitted?

"MR. BUSBY: No, your Honor. I believe this witness will conclude the evidence on behalf of Miss Loughran.

"THE COURT: How about the government?

"MR. MILLER: The government has no further evidence.

"THE COURT: All right. Proceed.

"BY MR. MILLER:

"Q Doctor, I don't know whether I got an answer to my last question. That was, how long did these examinations last, approximately?

"A Well, as I said, I approximately spent a total I would say of three hours with her, because I stayed late at night, and then about half an hour with her relatives. A total of three and a half hours, but the time spent in examination with her, talking to her, about three hours, I would say.

"Q Did you make a physical examination of her, Doctor?

"A No, I didn't, as yet.

"Q As far as you know, did any other doctor with whom you are associated make a physical examination of Miss Loughran?

"A Aside from the general inspection done by nurses at the time of admission, no, we did not do any formal physical examination.

"Q Were any psychological tests performed as were described by Dr. Marcus?

"A No, sir.

"Q I take it, then, that no clinical psychologist had an opportunity to examine Miss Loughran; is that correct?

"A Correct.

"Q Was that included in your examination, sir?

"A Just talking to her.

"Q Just talking to her?

"A Yes. That is usually what a psychiatric examination is like, externally speaking.

"Q You say you talked to Miss Loughran and some of her relatives; is that correct?

"A That's correct.

"Q It was actually from them that you received the information with reference to what the situation was down here in the Federal Building, that is, what she was facing?

"A Part of the information I also received from Mr. Busby.

"Q Doctor, I take it from your testimony on direct examination that you believe in your professional judgment Miss Loughran has the ability to appreciate the consequences of an oath before the grand jury; is that correct?

"A I do, yes, sir.

"Q And, likewise, I will ask you whether you believe that she has the capacity to give a correct statement of past events which she saw and heard, in answer to questions propounded to her.

"A Well, I think at the moment she does not.

"Q Doctor, you have used during your testimony on direct and now on cross the term 'at the moment'; I take it when you say 'at the moment' you mean now as of the time that you examined her; is that correct?

"A As of the time that I examined her, and covering maybe 24 hours back, and I don't know, 72 hours prospectively.

"Q Doctor, why do you choose 72 hours?

"A Three times 24. I could also have said—in that kind of an estimate, I could also have said 48. I just wanted to define closer what I meant by 'at the moment', which covers not only the exact moment of talking to a person, but maybe a little time ahead and a little time later. But I am not able to substantiate why I say 72 or 48 hours.

"Q Doctor, I am not trying to be discourteous; I am trying to examine you. What I am getting at is this, Doctor: Would it be a possibility that Miss Loughran's condition might change, let's say, within the next hour?

"A Well, I think her condition is characterized by a tremendous amount of emotional instability, as was also mentioned, though maybe in different words, in Dr. Marcus' report. And, of course, she changes sometimes from moment to moment. But I think as a general trend, I would not think that one can do much with her in the next hour or so.

"Q And I would ask you why. Would it be because she would be hysterical to the point that she couldn't express herself by reason of tears, let us say?

"A Oh, no, I don't mean that. I would think that as a result of—let me put it this way: Though I don't mean to be lecturing, but as the result of anxiety and tension, even without any mental illness, the processes of recollection, of honest recollection, are tremendously impaired. We all know that in an examination situation to which some neurotic people react in a major way, you simply cannot remember for a while; that very many people cannot function under this kind of stress. So they are not mentally ill by any stretch of the imagination, and therefore the accepted psychiatric practice is to attempt, at least, to bring that person over that particular hurdle in the relatively sure expectation that with a change of the external situation this person will be able to produce.

"Q Doctor, you have stated, haven't you, that Miss Loughran as far as you are concerned is not mentally ill; that is correct, isn't it?

"A That is correct. I mean not mentally ill in a major way, there I completely agree. I would adopt what Dr. Marcus has said.

"Q It is your testimony, as I understand it, that you believe that her memory would be somewhat impaired at this time by reason of her hysterical state; is that correct?

"A Not only somewhat, but possibly fundamentally and very completely. And that despite her best efforts in that direction, she just could not deliver.

"Q Is that your testimony, that Miss Loughran cannot answer questions?

"A I think this is a possibility at the moment. Cannot answer questions reasonably and responsively.

"Q And you have determined this by reason of having spoken to her for three and a half hours?

"A Three hours.

"Q Three hours?

"A Yes, sir.

"Q That is your—

"A And on the basis of my general experience.

"Q And that is a conclusion which you say is a possibility; is that correct?

"A It is a conclusion as to a possibility or probability, yes, sir.

"Q Doctor, getting into the area of what, if any, damage would result by reason of Miss Loughran's testimony before the grand jury, you stated that Miss Loughran has demonstrated certain suicidal gestures; is that correct?

"A No, I haven't said it that way.

"Q Would you comment on that, sir?

"A Yes. I think the history shows that she has, presumably unrelated to any legal proceedings or anything of that nature, attempted suicide in the past, at least at one time. The history also indicates psychiatric treatment in the past, though of a very short duration, in which apparently the question of self-destruction played a major part.

"I, further, testified, or will testify now that in her preoccupation at the moment, in her panic and anxiety, she threatens and talks a great, great deal about the possibility of suicide. Putting all of these things together, I would say that this is, classically speaking, a suicidal danger at the moment. Coupled, as it were, in this particular instance with all kinds of wild and somewhat infantile and somewhat thought-out threats about doing this or the other thing, like escape, like flight, like hiding, all this sort of thing, but always coming back to the possible self-destruction, which in the context of the general personality picture is, in my opinion, a distinct suicidal threat.

"Q Doctor, I believe you used the terms, during your direct examination, 'suicidal gesture' as opposed to 'suicidal intention'; is that not a fact?

"A I said I was not capable of distinguishing between the two. I suppose a gesture is something—one calls something a gesture when it misfires, then it was a gesture.

"Q Doctor, let me ask you this, sir: Are there not those individuals who by reason of the fact that they wish to dramatize and perhaps state to the world or state to certain persons who are around them, 'I am very, very unhappy with the circumstances in which I find myself, I am going to commit suicide' —aren't there such persons who make this statement as a gesture, but who do not actually intend to commit the act itself?

"A The answer is 'Yes.' But let me qualify that. A verbal statement alone would not be qualified as a gesture. A gesture would be an act that follows the verbal statement that is presumably intended to produce suicide.

"When you ask, as you did, whether that is frequently done in order to attract attention, in order to, sort of speak, advertise that one is unhappy, in order to engage the sympathy or help of the environment, then that is certainly one of the most frequent causes for suicidal gestures. It is also the most frequent cause of suicide.

"Q Are you saying, then, that in certain situations a gesture by reason of a mistake or miscalculation on the part of a person making this gesture can, in fact, result in something more serious than the individual intended?

"A Not only do I say it can happen, it does happen in the majority of cases. And many of the cases that are very much in the public mind and have been very much advertised and received a lot of publicity would have been, the day before they committed the act, considered to be hysterical personalities who just make suicidal gestures. But the day afterward they were called suicides.

"Q In your judgment, then, is Miss Loughran dangerous to herself?

"A Yes, sir.

"Q You believe she is?

"A Yes.

"Q Would she be dangerous to others in the community?

"A I do not believe so.

"Q I take it, then, if she is danger-

ous to herself that you must recommend some sort of controlled environment for her, or commitment; is that correct?

"A I did. Commitment is not necessary insofar as she consents to it.

"Q You would recommend she be confined to some sort of mental hospital, is that so?

"A We have done that. I would go further and would be prepared, if she attempted to assign herself out voluntarily, I would feel it my professional duty, in view of her danger to herself, to start commitment proceedings.

"Q Doctor, how long do you believe that it will be necessary for Miss Loughran to be confined under controlled care?

"A I would estimate about three or four weeks.

"Q Doctor, if during this three or four-week period Miss Loughran were made available for questioning under controlled conditions, that is, where there would be people who could watch her in order to consider her safety, would you say then that the questioning before the grand jury would be less dangerous, would not be dangerous to her personally by reason of the protection afforded her?

"Is my question clear, or should I break it down?

"A No, I am sorry. Would you break it down?

"Q In other words, if she were to be brought to court under conditions whereby yourself or other competent individuals would be around her and watching her, wouldn't it be a fair statement to say that then such questioning, since she would be returned to the hospital, would not endanger her life, because in fact she would be guarded and she would be safeguarded so she wouldn't and couldn't make these gestures?

"Q Of course, a suicidal danger can be minimized by guarding her constantly, that is true. But the plan is at the moment, certainly, to completely make her available for further questioning either after the lapse of that time or during it, but so far we did not have a

chance to thoroughly examine her. I voluntarily even make the offer to have Dr. Marcus, who is an esteemed colleague, of course, to participate in the procedure, and then make her available whenever we feel that her recollection is most trustworthy and not inhibited any more by a panic state in which she may say or do anything.

"Q Doctor, with regard to this trustworthy state that you speak of, is that by reason of your interest as to what the grand jury would learn, or is this in the interest of the witness?

"A At the moment, in regard to that statement, I do not distinguish too closely between the two. I think at the moment she is not that panicky any more, not that distressed any more. It will be less of a strain and damage to her, and I think it will, incidentally, also be of more benefit to the truth finding.

"Q Doctor, then following that statement, assuming that Miss Loughran has consented to admission under supervision until such time, I take it, as you feel that she would no longer be dangerous to herself, would you have any objection to her being questioned under appropriate conditions, with your being nearby, this afternoon, in the grand jury room by the federal grand jury?

"A Well, at this moment, I would. At a later date, which I cannot specify right now, but which need not be as long as the time period indicated before, I think I would see—

"THE COURT: Let me ask you, Doctor. What harm could come to her this afternoon if she were ordered up before the grand jury to answer questions again and you were outside, and say Dr. Marcus, too, and they proceeded with the questioning?

"THE WITNESS: She could—obviously, the suicidal danger would be obviated.

"THE COURT: There wouldn't be any danger to her health, would there?

"THE WITNESS: Not to her immediate physical health, no, sir.

"THE COURT: Or to her mind?

"THE WITNESS: Well, only as stated before—

"THE COURT: There would be this panic, this anxiety you speak of; but would there be anything beyond that?

"THE WITNESS: I don't mean, your Honor, by anxiety, just a little sweating or sleeplessness and so on. I think as a result of that anxiety she is likely to do and say anything, particularly also to say anything, and I would personally and professionally not advise that this be done within 10 or 12 or 24 hours. But if it were so ordered, I would think that participation of professional people would minimize whatever danger is inherent.

"THE COURT: In the course of your examination did you get any indication from her or from her relatives, or anybody, that any part of this anxiety, fear, stress, whatever you want to call it, arises because of some fear of things that might happen to her in the event of any disclosure of things with respect to her friends, I mean things that might happen to her caused by her friends, or those about whom she might testify?

"THE WITNESS: To her?

"THE COURT: That's right.

"THE WITNESS: So far there was no such indication.

"THE COURT: Where do you think this conflict arises, between her obligation to testify to the truth, in view of the grant of immunity, on the one hand, and the fear of what—fear of consequences from those about whom she might testify or whom she might fear?

"THE WITNESS: That is certainly conceivable. As she describes it right now, it is more a conscious conflict about incriminating other people that have been friendly to her, about possibly still throwing some doubts on her own public character about which she is very much concerned, about which she feels exposed, and surrounded by enemies, and alone, and all that kind of thing, all of which falls in the area of anxiety manifestations—

"THE COURT: But if the proceedings are entirely secret, then there is no public disclosure, is there?

"THE WITNESS: I think if it could be made secret, if it could be made with the participation of people she trusts, I think all that would be minimizing. I think it would also be minimized if it could be postponed for a tiny little while, maybe for days. But that is just an evaluation of possibilities.

"THE COURT: Yes. When you say 'days,' are you talking about 48 hours, or maybe 72, two or three days? Those are, again, possibilities?

"THE WITNESS: Yes.

"THE COURT: She might be a lot better off this afternoon than she would be three days after?

"THE WITNESS: I doubt that.

"THE COURT: It is possible, though?

"THE WITNESS: Everything is possible.

"I would bargain for time. I would say 72 hours is better than this afternoon. Because we would then have an opportunity to try to calm her some, and so on.

"MR. MILLER: The government has no further questions.

"THE COURT: Mr. Busby?

"REDIRECT EXAMINATION
"BY MR. BUSBY:

"Q Dr. Hacker, you had an opportunity to read the psychological conclusions as a result of the tests in Dr. Marcus' report, did you not, sir?

"A No, I did not.

"Q They are in front of you. Only the part, sir, in which he has pulled what he considered to be the relevant materials. Do you see that on page 2, paragraph 3?

"A Yes. And I heard Dr. Marcus' testimony that he has extracted from a condensed psychological report those items that appear to him most significant. But insofar as, according to the patient, she has spent only about 15 minutes talking to Dr. Marcus clinically,

and has spent the rest of the time, approximately four hours, doing the tests, I, of course, would very much like to see the tests. I would accept the tests that were done by Dr. Marcus' psychologist at face value, but I would like to see what the results of it are, which are here condensed only in seven lines, which are the result of four hours of testing.

"MR. BUSBY: I have nothing further. That's all.

"MR. MILLER: Your Honor, might the documents which the doctor is relying upon be produced to counsel at this time?

"THE COURT: All right.

"The documents you were looking at in the course of your testimony, Doctor.

"THE WITNESS: This (indicating).

"MR. MILLER: I would ask that the documents which have not been marked, which the Doctor relied upon, be marked as an exhibit.

"THE COURT: We will make it Government's Exhibit 2 for identification.

"THE WITNESS: These two sheets?

"THE COURT: What is it you had in mind? He wants to know which sheets you mean.

"MR. MILLER: Let me ask you this, sir: What documents do you have with you?

"THE WITNESS: I have with me a sheet of what we call an intake sheet, which is purely administrative, on which it states the name, the address of the patient, and the person that referred her.

"MR. MILLER: Were these, in effect, admitting documents in the clinic?

"THE WITNESS: Yes.

"MR. MILLER: What else do you have with you?

"THE WITNESS: I have with me an admission note dictated and signed by me—not signed here—the copy of an admission note that the original is signed by me as part of the hospital record, in which I communicated my impressions on admission.

"I have, also, with me a report of a psychiatric interview with our staff physician, Dr. Braverman.

"MR. MILLER: Your Honor, the government would request that these documents be marked as Government's Exhibit 2 and that the government be permitted to photostat them, returning the original documents to the Doctor.

"THE COURT: Well, yes. Let me see them a second.

"(Documents handed to the court.)

"THE COURT: I think we had better mark them all into evidence if the government so desires.

"MR. MILLER: Thank you, sir.

"THE COURT: Into evidence, Exhibit 2. They will be Xeroxed and you will get your copies back from Mr. Miller. If you have any trouble, see the court about it. Mr. Busby can arrange for it.

"(The exhibit referred to was received in evidence as Government's Exhibit No. 2.)

"MR. BUSBY: That will conclude the evidence.

"THE COURT: Any further evidence?

"MR. MILLER: The government has no further evidence.

"THE COURT: We are at 12:30. I want to examine these documents. We will have to recess at this time, though I have to take care of two other matters, or three other matters, before lunch, and reconvene at 2:00 o'clock on this Loughran matter.

"Is Miss Loughran in any kind of custody at the moment?

"MR. BUSBY: No, she is not.

"THE WITNESS: She is accompanied by us. She is still officially a patient of the St. Francis Hospital.

"THE COURT: That won't inconvenience the hospital or be injurious to Miss Loughran, to appear at 2:00 o'clock?

"THE WITNESS: No."[27]

During the recess the Court studied and analyzed once again the decisionary law governing the determination of competency of witnesses. It is clear that the basic standard of competency is the one first announced by the Supreme Court in District of Columbia v. Armes, 107 U.S. 519, 522, 2 S.Ct. 840, 842, 27 L.Ed. 618, 619 (1882):

> "The general rule, therefore, is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court, upon examination of the party himself, and any competent witnesses who can speak to the nature and extent of his insanity."

In *Armes,* the Court upheld the admissibility of the testimony of an acute melancholic, who was confined to an asylum and has several times attempted suicide by sticking a fork into his neck. The Court stressed that "the existence of partial insanity does not unfit individuals so affected * * * from giving a perfectly accurate and lucid statement of what they have seen or heard." [28]

The standard of competency established in *Armes* was cited and relied upon by the Ninth Circuit Court of Appeals in Shibley v. United States, 237 F.2d 327, 334 (C.A. 9th 1956), cert. den. 352 U.S. 873, 77 S. Ct. 94, 1 L.Ed.2d 77, holding a trial court did not err in admitting the testimony of a witness previously adjudicated insane. [29]

In determining the competency of a witness, an "understanding of the proceedings" is clearly not a prerequisite, as it would be in the case of a defendant. Such an argument was rejected in Carter v. United States, 332 F.2d 728 (C.A.8th 1964), cert. den. 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed.2d 47 (1964), where the difference in the standards to determine competency of witnesses and competency of a defendant to stand trial was clearly spelled out:

> "We have not in this Circuit accepted this loose and unobjective standard as a basis for measuring criminal capacity and responsibility on the part of an accused. But even where this has been done, it could not afford a basis for the projection of these theoretical concepts on criminal responsibility into the unrelated and practical field of what judicial experience has found to be the most useful and satisfactory test of witness competency for trial purposes —the capacity to communicate relevant material and to understand that there is an obligation to do so truthfully." [30]

A more stringent standard than that applied to trial proceedings certainly cannot be applied to determine competency of a witness to testify before a Grand Jury, whose function is primarily investigative. The testimony of the witness Loughran will not be weighed to determine substantive rights between parties, but only as a possible link in a wide-ranging investigation. As stated by Judge Prettyman of the United States Court of Appeals for the District of Columbia Circuit, "the grand jury is an in-

27. Rep.Tr. Dec. 20, 1966, p. 39, line 18— p. 77, line 6, incl.

28. 107 U.S. 519 at 521, 25 S.Ct. 840 at 842, 27 L.Ed. 618 at 619. See also, generally, Juvilier, Psychiatric Opinions As To The Credibility of Witnesses: A Suggested Approach, 48 Calif.L.Rev. 648 (1960).

29. Wigmore also cites *Armes* as the leading authority in the Federal jurisdiction: Sec. II WIGMORE EVIDENCE, (3rd Ed. 1940) Secs. 492–501, esp. 496, p. 588. See also: New York Evening Post Co. v. Chaloner, 265 F. 204, 216–217 (C.A.2d 1920), cert. den. 252 U.S. 591, 40 S.Ct. 396, 64 L.Ed. 731 (1920); In re Paul, 18 F.2d 448 (W.D. Wash.1926); Ross v. United States, 93 F.2d 950, 951 (C.A.7th, 1937).

30. 332 F.2d 728 at 729–730 (C.A.8th, 1964).

vestigating body. If it is to function at all, it must ask questions." Jones v. United States, 119 U.S.App.D.C. 284, 342 F. 2d 863, 881 (1964).

 It is apparent from these authorities that the tests in determining competency of a witness before the Grand Jury, however we might state them, are basically the following:

*First*: the witness must have a sufficient understanding to apprehend the obligation of an oath, and to tell the truth before the grand jury.

*Second*: the witness must be capable of giving a correct account, or at least a reasonably correct account, of the matters which he or she has seen or heard, and in reference to which the questions at issue are being asked.

*Third*: these two issues must be determined by the court, not only upon the testimony of expert medical witnesses who may be called by the government or by the witness' counsel, but also upon the court's own examination. This is a duty that the court cannot avoid merely by referring to or quoting from statements of the medical experts. The court must make its own determination and its own examination, so to speak.

*Fourth and finally*: the Court must be assured that the physical and mental health of the witness will not be damaged, impaired, or in any way harmed in any significant way.

 Now, let us make that last test first. Drs. Hacker and Marcus both testified in substantially similar terms, that is, that the witness Loughran is in a highly nervous, hysterical, distraught, strained state; that she seems to rise and fall in this state, that is, to higher or lower degrees of intensity, depending somewhat upon whether she is before the grand jury or in court in connection with the grand jury proceedings, or under interrogation by the doctors. Additionally the doctors apparently state that—and the Court noticed this in observing the

witness on the stand—after the interrogation starts she seems to be all right and she is able to handle herself well enough, occasionally bursting into tears, or otherwise exhibiting some nervous traits, it is true, but not in the Court's opinion collapsing into a complete loss of memory or into a state of untruthfulness, or unconscious inability to tell the truth, such as might disqualify her or be harmful to her in her physical or mental health.

In that connection, we refer to the fact that Dr. Hacker, in general, agrees with the conclusions and opinions and findings of Dr. Marcus. He indicates he would have conducted the same psychological tests and physical tests, that is, tests by means of physical apparatuses, if he had been afforded more time to make a more complete examination.

 So basically the doctors are not in disagreement. They both clearly believe that the witness Loughran does have the ability and capacity to know, and sufficient understanding to apprehend, the obligations of the oath, and to be capable of giving a correct account of the matters which she has seen and heard. To put it another way, as one of the cases does, Carter v. United States,[31] "the capacity to communicate relevant material and to understand that there is an obligation to do so truthfully," is all that is required, and the witness Loughran has this capacity.

There is an indication that Dr. Hacker, as he puts it, would lay a little different emphasis on this latter qualification or capacity, the capacity to testify truthfully, in that he said he would emphasize that there could be certain temporary lapses from the ability or capacity to communicate accurately and truthfully events the witness Loughran had seen or heard in the past. But he added that these would not necessarily be long-lasting.

In this state of affairs it seems the only answer is the answer that Dr. Hacker, himself, suggested, at least it appears to

31. 332 F.2d 728 at 730 (C.A.8th, 1964).

be the best answer: that psychotherapy continue; that she continue to be treated in the hospital and that she be released intermittently; and that she testify at not-too-long stretches. It seems that an afternoon is not too long a stretch and if the witness were ordered to testify for an afternoon and then be released to Dr. Hacker's care for treatment in the evening and perhaps again the next morning, she would be able to come back the next afternoon and testify again if that be required by the Grand Jury. As Dr. Hacker put it, during this time of treatment which might last anywhere from three to four weeks, she can be available for questioning on intermittent afternoons.

Before the Court made and entered the Order, the following explanation and admonition were given to the witness Loughran:

"I know the doctors sometimes hedge back and forth. I don't blame them. This is not an absolutely accurate science or art, the study of the human mind, human reactions, human emotions. Nor is, of course, the study of human physical ill-health and illness, or disability and disease, truly a completely accurate science or art. Once you get into the finer distinctions, it is like everything else in life, I am sure, that everyone has found. As you get into things more intensely you find you are less able to comprehend them with certainty, absolute certainty. But we must carry on the best we can under all human considerations involved and do the best job we can with our limited human knowledge and insight. And that's what the Court's job is, to do just that.

"There could be, it is indicated by both doctors, a temporary mental health problem. Not disease, not injury, not damage in the sense of injuring a mind that would never come back. But a certain amount of pain and suffering would be connected with the witness Loughran's testifying under stress conditions.

"I suppose it would be difficult for anyone, including this Court, to have to go before a Grand Jury, particularly if the objective of the Grand Jury was to inquire into actions, motives, aspirations—criminal conduct, if you will—of friends or relatives, after having been granted immunity, and therefore having lost the cloak or mantle provided by the Fifth Amendment against self-incrimination. It would be difficult, as I say, even for this Court, or any lawyer. No one would like it. It is a situation of stress. I am sure any one of us in going before the Grand Jury would perspire. I don't think there is any doubt about that. We would get nervous. We might even tend to become hysterical if the thing pressed close enough to home.

"But that in and of itself, that problem, although clearly one of physical and even mental temporary disability or temporary injury, temporary deviation from the normal, is necessary and essential in the preservation of our democracy. It seems to me the Grand Jury is the great shield of the innocent, the great sword of justice to take up against the guilty. It is the means by which evidence of crime is uncovered in this country, and the means by which it is uncovered democratically by a Grand Jury fairly chosen from the citizenry at random and able to make its own decisions based on evidence presented. Without evidence the Grand Jury cannot act. If it cannot act, it is powerless. If it is powerless, then crime can run rampant. And the Court can't stand for that.

"So though it may be inconvenient, it may be discomforting and it may even be, in the sense I have indicated, a temporary mental or physical injury, accompanied by some skin spots, some blemishes, heat rash, or whatever, on Miss Loughran. Nevertheless it is not really in any sense the Court's fault that she is in the situation she is in. She picked her own friends, I suppose, or somehow they picked her. At any rate, whatever it be, she has been granted immunity.

"And in that connection, I would like to say to the witness, when I make my order, that you go back before the Grand Jury and answer without fear of retaliation by anyone, and I mean whether that

person bear his given name or a soubriquet or nickname, the name he was born with, or the name he has assumed, whether it be 'Winky the Blinky' or 'Jimmy Greeneyes' or 'Abie the Fink' or whatever you want to call him, or 'Fatso the Lard Head' or whatever. Any such person you need not fear, because whether he comes from the underworld of the Bronx, the middle world of Miami Beach, or the upper world of Caesar's Palace and Las Vegas, this Court will not permit or tolerate the presumptuousness or stupidity of anyone, either presumptuous enough or stupid enough to try, attempting to interfere with the Grand Jury's operations by any kind of intimidation, suggestion or activity with respect to a witness. The Court will retaliate with a swift, certain and heavy hand, utilizing each one of the weapons that are available in our arsenal of justice here at our command. And they, believe me, are varied and efficient indeed.

"To the Grand Jury I say, when I make my order, that you can go back and carry out the hallowed and sacred trust that is yours, and preserve absolutely inviolate the faith you have sworn to protect. In this way you hold fast the shield which ensures the safety of us all, and you can strike out with this sword of justice, thereby vindicating the rule of law over the force and violence of the mob, the syndicate, the Cosa Nostra, the 'Family', the Mafia, the crooks, the bums, the enemies of society by whatever names or nicknames they are born with or assume or fancy.

"And if part of your fear, Miss Loughran, is the fear of your friends or one-time friends, I beg you fear not, because they won't dare touch you if you tell the truth. The truth is the greatest armor, the greatest strength, the greatest bulwark that anyone can have, and once you do tell the truth under the grant of immunity, I am confident that your present fears, your present anxieties, your tremblings, your nervousness, your excitement about this thing, will all disappear. You will feel refreshed and

strong, I am confident, once you determine you will tell the truth and do your best to tell the truth, and that is all you have to do, so that the ends of justice may be met.

"So my order is that the witness shall testify under the conditions that I have indicated, namely that Dr. Hacker and Dr. Marcus—Dr. Hacker as the treating physician and Dr. Marcus as an observer for the Court—be and are hereby appointed by the Court, at government expense, to care for, treat and observe—Dr. Hacker to care for and treat, Dr. Marcus to observe—the witness, and at the instance of the U. S. Attorney to be within close proximity of the Grand Jury room, that is, within reasonable call immediately should any emergency arise, or there be any need of this young lady to have medical care, so that they can be there present to take care of her and observe her. And that then she be returned to the hospital to be brought back for further questioning at the instance of the United States Attorney under the conditions I have indicated, namely for short periods of questioning. I don't think it should in any case go longer than one hour at a time, and no more than two or two and one half hours in any one day.

"I think that is a sufficient time to be questioning this witness in her present state.

"She should also be given any opportunity to relieve herself and take care of human functions, some of which she has apparently experienced some difficulty with. I would leave that to the doctors to indicate the times she should be given rest periods.

"And on those conditions the witness Natalie Loughran, also know as Vickie Lockwood or Victoria Lockwood, is hereby ordered to return to the Grand Jury room for further questioning at the instance of the Assistant United States Attorneys into the matters there presently under inquiry, secure in the knowledge she has been granted immunity from any possible prosecution of herself because of

any possible testimony she may give under this interrogation.

"I would add this admonishment to the United States Attorneys: Be kind and gentle. Don't be rough. I am sure you are not. I feel confident you haven't been, from the questions I have heard here in the transcript. You have not been, as I say, overly forceful. But I would ask you to continue to be careful and considerate.

"I think with this Order that the ends of justice will be served and yet the health and welfare both mental and physical, as well as emotional, of this witness will be preserved, a just and due concern of the Court as much as the seeking of justice." [32]

Thereupon, the Court made and entered the following formal written order determining the witness Loughran to be mentally competent and compelling her to return to the Grand Jury for further questioning with the attendance, treatment and observation of Drs. Hacker and Marcus:

"ORDER. The Court, having determined that the respondent, Natalie Loughran, also known as Vickie Lockwood, is mentally competent to testify before the duly constituted Grand Jury, and having determined that continuing psychiatric treatment and observation of the respondent should be available while she is in attendance before the Grand Jury.

"IT IS ORDERED that the respondent, Natalie Loughran, also known as Vickie Lockwood, appear before the Grand Jury as directed by that body, to answer questions propounded to her before said Grand Jury;

"IT IS FURTHER ORDERED that Dr. Frederick Hacker, whom the Court finds is a qualified and competent psychiatrist, be and he hereby is appointed to remain in attendance during all appearances of the respondent directed by the Grand Jury, to render any treatment occasioned by such appear-

ances, and to observe any change in respondent's mental competency. In the event that Dr. Hacker is unable to attend any such appearance, he is directed to appoint an authorized physician of the Hacker Clinic to remain in attendance for such appearance;

"IT IS FURTHER ORDERED that Dr. Eric Marcus, whom the Court finds is a qualified and competent psychiatrist, be and he hereby is appointed to remain in attendance during all appearances of the respondent directed by the Grand Jury, to observe any change in respondent's mental competency;

"IT IS FURTHER ORDERED that such treatment and observation be at the expense of the United States Government, and any change in respondent's mental competency be reported by Dr. Hacker and Dr. Marcus to the Judge of this Court, with copies of said reports to the United States Attorney and to Daniel Busby, attorney for respondent, whose address is 205 South Broadway, Suite 1008, Los Angeles, California 90012.

DATED: January 3, 1967

A. ANDREW HAUK /s/
A. ANDREW HAUK
United States District Judge"

Pursuant to this Order the witness Loughran returned to the Grand Jury for further interrogation. And as of the present date—August 30, 1967, almost eight months later—nothing further has come before the Court. No appeal has been taken and no further proceedings have been instituted on behalf of the Government or the witness. Nor has any report been received from either of the two psychiatrists appointed by the Court to attend, treat and observe her.

Therefore the Court must assume, and reasonably so, that the witness Loughran has obeyed the Court's Order; that she has answered the questions of the Grand Jury; that in no way has this obedience to the Order caused the witness any harm—physical, mental or emotional;

32. Rep.Tr. Dec. 29, 1966, p. 61, line 11—p. 97, line 10, inclusive.

and that the procedures followed by the Court appear to have been appropriate and well adapted to achieving the ends desired: (1) confirmation of immunity; and (2) compulsory testimony before the Grand Jury.