COMMONWEALTH *vs.* LAWYER JOHNSON.

Suffolk.   January 7, 1974. — July 1, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Practice, Criminal*, Access to witnesses, Disclosure of evidence, Fair trial.   *Evidence*, On cross-examination.   *Constitutional Law*, Confrontation of witnesses, Access to witness, Due process of law.   *Witness*, Cross-examination.

Discussion of the circumstances in which a court may refuse to elicit information from a witness in fear of his safety or the safety of others. [543-546]

A judge's refusal to order an eyewitness to a murder to reveal the identities of two other persons who the witness said were present at the scene was reversible error, where the judge made no attempt at orderly appraisal of any threat to the witness or to others and the materiality of the testimony sought, and where the prosecution, despite explicit orders, failed to identify the two persons. [539-548]

INDICTMENT found and returned in the Superior Court on February 9, 1972.

The case was tried before *Paquet, J.*

*John G. S. Flym* for the defendant.

*Thomas J. Mundy, Jr.*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendant, Lawyer Johnson, appeals under G. L. c. 278, §§ 33A-33G, from his conviction of first degree murder, with sentence of death, as well as from the denial of his motion for a new trial. The assignments of error are numerous, but it will not be necessary to examine them or the facts of the case comprehensively, since there was a material error requiring reversal, and the other questions are not likely to arise on retrial.[1] The error consisted of the trial judge's refusal to take any steps to

[1] Other errors assigned and argued relate to the manner in which the jury were selected and empanelled; refusal to strike statements by the defendant before he

order, induce, or compel a crucial prosecution witness — one Kenneth Myers — to give testimony on potentially significant matters within his own claimed knowledge.

We shall describe as much of the case as is necessary to understanding, analyze the error, and comment on the Commonwealth's slackness in furnishing material to the defence under pre-trial orders.

1. About 4:45 P.M., December 7, 1971, Boston police officer Anthony DiFonzo was on paid detail at the Parker Street Lounge near the corner of Parker and Prentiss streets in Roxbury. Someone came in and said, "A man has been shot." Officer DiFonzo ran out of the Lounge and followed a crowd to 71 Prentiss Street. There he found a white man sprawled on his back on the steps and landing leading to the entrance door of the apartment house. The man was bleeding from the face, unconscious but still breathing. He had been shot. It appeared later that one bullet had lodged in fragmented form in his skull, another had passed through the front part of his face. DiFonzo summoned a police ambulance which arrived within a few minutes. The victim was taken to Boston City Hospital where he died later that day.

DiFonzo had spoken with people at the scene, and at the Parker Street Lounge on his return there, and had taken down some names, evidently of possible witnesses. He turned the list over to Officer Francis McDonough who had arrived when the victim was being placed in the ambulance. McDonough recognized the name of Kenneth Myers on the list. Seeing Myers in the crowd, McDonough approached him and placed him in a police cruiser in which he was taken to the District 2 police station in Roxbury.

While in the police car and later that evening at the station, Myers (then seventeen years old) gave the police

was advised of *Miranda* rights; refusal to order the prosecution to disclose before trial the identity of an informer or to grant a continuance during trial for investigation concerning him; denial of directed verdict; instructions to the jury on first degree murder and self-defence; failure to record at trial a number of bench conferences; denial of motion for a new trial based on newly discovered evidence; and the prosecution's failure to comply with pre-trial orders.

officers an account in which he claimed to have seen two black men, unknown to him, shoot down the victim. He said he might be able to identify one or both of these men. Accordingly he was taken to headquarters where he examined a number of pictures and identified one. He was returned to District 2 before nine o'clock that night. By that time he had reason to apprehend that someone had observed the shooting at close range.[2] He signed a statement in part as follows. He had been walking in the vicinity of 71 Prentiss Street when he saw the victim drive up alone in a Mustang, get out, and walk up the steps of the building, taking a gun out of his pocket. As the victim opened the door, two black men came out and began to argue with him about bad drugs. Before the victim had a chance to fire, the black men fired. Myers was not sure both fired, but he heard two shots. Myers was in the line of fire, so he squatted down by the side of the chain link fence next to the entrance of 71 Prentiss Street. He saw the black men move the victim and grab something, and believed they took the victim's gun and brown lunch bag, "because when Gary Pritcher and me got to the white man they were not there." The two assailants ran past Myers along the fence not more than five feet from him. He did not know the black men or the victim, but thought he could identify the man whose picture he had selected if he saw him in a lineup. "My girl was there when the argument started but she told me not to be nosey and she left me there. No one else was there."

When a check was made of the person whose picture was identified by Myers (one Vaughn Simkins), it turned out he was then in prison.

At this point Myers was taken to the District 4 station where a warrant was outstanding for him on an unrelated offence. Shortly before midnight Myers asked to see the investigating officers of District 2. When they arrived he led them to the roof of 61 Prentiss Street where he showed them a gun in a paper bag hidden on top of the stairway roofing.

---

[2] Myers testified that shortly after he arrived at the District 2 station one of the officers there told him a woman in the first floor apartment at 71 Prentiss Street had witnessed the event.

At 12:30 P.M. the next day, December 8, Myers, under interrogation by Detectives Friel and Finnel, made a second statement different from the first and implicating the defendant Johnson. It was in part as follows. Around 4 P.M. he had left Paul's Foodland on Parker Street near Prentiss Street and gone to the front hallway of 71 Prentiss Street to visit Mrs. Mack, mother of a friend, Marlene Mack. On the way in he had seen a white man get out of a Mustang car and walk toward 71 Prentiss Street. In the hallway this man asked Myers whether he knew a "Robinson"; Myers said he did not, he didn't think a Robinson lived in that building. The man "started back out the door," by which time Myers was on the steps outside. The defendant Johnson (whom Myers knew well) was on the porch with another black man whom Myers did not know. "They said they were going to rob that man and did I want to help them. . . . I didn't say nothing." (Q. "You figured if they made a hit you would get something and if they didn't you would not be involved." A. "Right.") As the white man came out, his way was blocked by the defendant and his companion. The white man drew a gun but hesitated; the defendant, drawing a gun out of his left coat pocket, fired twice at very close range into the white man's face. Myers was two feet away on the landing. The defendant's gun was a nickel plated automatic; the white man's looked the same. As the white man fell, the black men fled. Myers took the gun out of the victim's hand; as he went around the corner he picked up a paper bag from the ground, put the gun in the bag, ran up to the roof of 61 Prentiss Street, and secreted the bag and gun there. He ran back to the scene. By then "the social worker, Pritchard was out there and he said, 'Kenny, what happened?', and I said 'I am not saying nothing.' " Concluding his statement, Myers repeated that he had never seen the defendant's companion before; he would not be able to identify him.

At this point we need to interpolate that the victim was identified as James Christian. The woman with whom Christian was living in Chelsea testified that he was addicted to drugs, and had left the place in Chelsea around

3:30 P.M. of December 7 with the evident intention of exchanging a gun for heroin. The gun Christian apparently took with him, as described by the woman, resembled the one uncovered by Myers on the roof of 61 Prentiss Street. It was a black, clip-fed, .22 caliber semi-automatic pistol with the clip missing.

In his live testimony, Myers strove to hold to the substance of his December 8 statement (and this version the jury evidently believed), while admitting that he had lied in his December 7 statement and that he changed his story and named Lawyer Johnson when it appeared that he might himself be accused. He added some circumstantial details to the December 8 recital, but not without a few variations from it,[3] such as that Johnson had said, "You wanna get him [the white man]?" (without mention of robbery), and later, after the shooting, "He was going to kill me" or "going to shoot me" (which may possibly be interpreted as referring, not to the immediate encounter, but to a quarrel of longer standing).[4]

A girl friend of Myers appeared in the December 7 statement but went unmentioned in the December 8 statement. From the witness stand Myers said that his girl friend accompanied him from Paul's Foodland to 71 Prentiss Street and then went on. Myers said she was not Marlene Mack, but he refused on cross-examination to give her name. Myers's second refusal to answer came when he was asked in cross-examination the name of the second assailant. He had denied knowing either black man in the December 7 statement, denied knowing the second man in his December 8 statement and, evidently, stuck to that denial in his grand jury and probable cause testimony. At trial, he first made the same denial as to the second man,

---

[3] Myers now stated that the defendant did not draw from his left pocket, but from his right, and that he, Myers, did not take a gun out of Christian's hand but rather had picked it up where it fell.

[4] One of the tires of the Mustang was flat, raising a possibility that Christian's escape was being blocked.

then admitted he did know him, but finally refused to name him.

Before discussing these refusals to answer, we refer to the other witnesses who testified damagingly about the defendant Johnson. An informer, Alvin Franklin, said the defendant, confined with Franklin in the Charles Street jail, had complained to him that someone "dropped a dime on him" (i.e., informed the police); had admitted that in a robbery attempt he had shot and killed the victim when the victim pulled a gun; and had named Myers and one Willie Bennett as having been with him at the time. Franklin said the defendant made these statements to him on or near the day the defendant arrived in jail, but it is not indicated that there was any friendship or intimacy between the defendant and Franklin before they met in jail. Franklin did know Myers. Myers in fact was also in the Charles Street jail in a cell next to Franklin's, had told Franklin about the same event, and said he wasn't going to "take the weight."

Patrolman George Vest, working from a photograph, arrested the defendant at the Sugar Shack on December 15. The defendant gave a false name and address at the time.

The defendant testified in his own behalf. He said he was at the Sugar Shack with his sister and another young woman. He admitted his falsehoods to Patrolman Vest, but laid them to his having been beaten up the last time someone had approached him and asked his name, and to a "bad habit" (of lying to cops). He did talk to one Boddie about his case when in jail, but never to Franklin, whose name he first learned in court that morning. He denied all connection with the crime and said he did not recall what he was doing on December 7.

2. In this uncertain condition of the proof connecting the defendant with the shooting, and with so much turning on Myers's testimony, the identity of the supposed second man was important; also important was the identity of Myers's girl friend who might have seen enough to contradict (or bolster) Myers's story.

In his direct examination Myers first said he did not know who the second man was. The following passage

shows Myers recanting this denial, and the judge forthwith excusing Myers from giving up the name.

THE PROSECUTOR: "I will ask you again, Mr. Myers, who was the man with Johnson outside on the steps?"[5]

THE JUDGE: "Well, do you know who it was?"

THE WITNESS: "Yeah."

THE JUDGE: "Why can't you answer the question?"

THE WITNESS: "I don't want to get involved. I am already involved, and I don't want to get any more in it."

THE JUDGE: "You don't want to give the name of the other person?"

THE WITNESS: "No, I don't."

THE JUDGE: "What is your reason?"

THE WITNESS: "Because I got to go on the street some day. That's my reason."

THE JUDGE: "You do not want to give the name of the other man because you are concerned with your own safety?"

THE WITNESS: "Yes."

THE JUDGE: "All right. I am not going to require him to do it under those circumstances."

On cross-examination of Myers, defence counsel reverted to the question of the identity of the second man, but could make no progress.

Q. "With respect to this other man, the other man who was supposed to have been with Johnson, remember on the day after this happened, on December 8, remember saying that you couldn't identify him?"

A. "Yes."

Q. "You said the same thing on the day before when you signed that statement that you didn't know who the other man was?"

A. "Yes."

Q. "And you testified before the Grand Jury, you also said that you didn't know who the other man was?"

A. "Yes."

---

[5] Defence counsel had objected to repetition of the question as the witness had previously answered and said he didn't know. Defence counsel evidently preferred to reserve his attack for cross-examination.

Q. "And at the probable cause hearing you also said you didn't know who the other man was?"

A. "Yes."

Q. "But you do know who the other man was?"

A. "Yes."

COUNSEL FOR THE DEFENDANT: "If your Honor please, the defendant needs the name that this man claims was the identity of the other man, because if there is any chance we can disprove this other man — "

THE JUDGE: "Now, listen. You cannot make an argument in front of the jury. I ruled that in view of this man's statement, I am not going to require that he give the name if he does not want to."

COUNSEL FOR THE DEFENDANT: "Please note my exception."

THE JUDGE: "Yes. You noted it yesterday. You may have it again."

The defence was also frustrated in trying to elicit the name of Myers's girl friend. Myers confirmed that the girl friend in question was not Marlene Mack. Then followed:

Q. "Well, was she with you at Paul's Foodland?"

A. "Yes."

Q. "Did she go down Prentiss Street with you?"

A. "Yes."

Q. "And then you went inside 71 Prentiss and then she continued on, right?"

A. "Yes."

Q. "Did you see where they went?"

A. "No."

Q. "Maybe she'd stay there, right?"

A. "No, she didn't."

THE JUDGE: "No, no. We can't have games . . . ."

COUNSEL FOR THE DEFENDANT: "Your Honor please, I would insist that the witness tell us who his girl friend's name is. She is a potential witness in this case."

THE WITNESS: "She ain't nothing."

COUNSEL FOR THE DEFENDANT: "You don't know that, do you?"

THE JUDGE: "Well, let's not have any discussions be-

tween you and the witness. You ask the questions and he will answer."

COUNSEL FOR THE DEFENDANT: "What is your girl friend's name?"

THE WITNESS: "None of your business."

THE JUDGE: "I am not going to require this man, in view of his testimony, to name that person."

COUNSEL FOR THE DEFENDANT: "Exception, your Honor, please."

THE JUDGE: "Well, if you have an exception to that, you tell me how I can require him to give the name. That will be a new one for me. . . ."

THE JUDGE: "Go ahead with your question."

COUNSEL FOR THE DEFENDANT: "You have contempt power, your Honor."

THE JUDGE: "I know my powers, young man, quite well. I have been exercising them for twenty-one years."

COUNSEL FOR THE DEFENDANT: "This man is on trial for his life."

THE JUDGE: " . . . no one knows that better than I do. What do you think I am presiding at, a motor vehicle collision case?"

We need not labor the point that the questions about the identity of the second assailant and the girl friend were within the range of a proper cross-examination. With Myers changing his story in material respects at least three times, pursuit of the identity of the two persons allegedly on the scene at or about the moment of the crime — one of them supposedly a guilty participant — was not beyond the "necessarily exploratory" breadth of cross-examination. *Alford* v. *United States*, 282 U. S. 687, 692 (1931). The prosecution did not object to the questions as ranging too far (or, indeed, on any other ground); the subject matter had in fact been broached by the prosecution in the direct examination of Myers, which brought out the presence of both individuals. Nor did the judge save Myers from answering on the ground that the questions exceeded the ordinary scope of legitimate interrogation of a prosecution

witness by the defence, and thus we do not encounter in this case any issue of discretionary control by the trial judge of the exact dimensions of cross-examination, as in cutting off undue exploration of collateral matters. See *Commonwealth* v. *Granito*, 326 Mass. 494, 496 (1950); *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 589-590 (1956).

We have said that "[a] fair and full cross-examination to develop facts in issue or relevant to the issue is a matter of absolute right and is not a mere privilege to be exercised at the sound discretion of the presiding judge, and the denial of the right is prejudicial error." *Gossman* v. *Rosenberg*, 237 Mass. 122, 124 (1921). In criminal cases this principle is related to the Sixth Amendment right of confrontation and to the like guaranty of art. 12 of our Declaration of Rights. See *Commonwealth* v. *Kerrigan*, 349 Mass. 295, 300 (1965); *Pointer* v. *Texas*, 380 U. S. 400, 405 (1965); *Washington* v. *Texas*, 388 U. S. 14, 17-18 (1967); *Dutton* v. *Evans*, 400 U. S. 74, 89 (1970); *Chambers* v. *Mississippi*, 410 U. S. 284, 293-295 (1973); *Davis* v. *Alaska*, 415 U. S. 308, 315-317 (1974),[6] and cases cited. In the present case, however, the trial judge apparently believed that the right was lost where a witness balked at answering because an answer might create a risk of harm to himself. As to the girl friend, not even that ground was asserted, and it may be that the judge was simply respecting some chivalrous intention that he imputed to the witness. (Conceivably the judge was assuming a possible risk to the girl, although the record nowhere hints at this — and, of course, the girl herself was not consulted.)

There are no clogs or limitations on the right to testimony such as the judge might have imagined to exist. A witness may not decline to respond to a proper question on the

---

[6] In the *Davis* case, the Supreme Court asserted that the defendant's interest in his Sixth Amendment right of confrontation — specifically the right of cross-examination — overcame a legitimate State interest in preserving the confidentiality of the juvenile delinquency record and probationary status of a prosecution witness (the confidentiality was required by statute). The State could use the witness only on terms of exposing him to full cross-examination directed to showing bias because of fear of having probation revoked and being suspected of the crime.

ground that his answer might embarrass him (or another). "[T]he sacrifice [due from every member of the community to give testimony] may be of his privacy, of the knowledge which he would preferably keep to himself because of the disagreeable consequences of disclosure. This inconvenience which he may suffer . . . by way of enmity or disgrace or ridicule or other disfavoring action of fellow members of the community, is . . . a contribution which he makes in payment of his duties to society in its function of executing justice." Wigmore, Evidence (McNaughton rev.) § 2192, p. 72 (1961).[7] Nor can fear of harm to the witness generally be offered as an excuse for declining testimony. Relief of witnesses on this ground would encourage intimidation of those in possession of information and proclaim a sorry confession of weakness of the rule of law. See *In re Loughran,* 276 F. Supp. 393 (C. D. Cal. 1967).

On two narrowly defined, exceptional occasions, risk to a person's safety may furnish reason for a court's refusal to elicit information, but the exceptions and their treatment by the courts serve to show the strength of the basic right to testimony. One set of cases deals with disclosure of an informer's identity, the other with disclosure of the residence address (and sometimes the name or place of employment) of a witness. In the former cases, there is a special governmental interest in encouraging communication to law enforcement agencies of information which may be otherwise unobtainable, and protection of the informer is a factor in the inducement. *Branzburg* v. *Hayes,* 408 U. S. 665, 698 (1972). It is the government that claims the "privilege," see *Scher* v. *United States,* 305 U. S. 251, 254 (1938), which is confined to its purpose, and cannot in any event be asserted where it interferes with a fair defence. "A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness.

---

[7] See *Matter of Pappas,* 358 Mass. 604, 607 (1971), affd. sub nom. *Branzburg* v. *Hayes,* 408 U. S. 665, 690 (1972); *Kastigar* v. *United States,* 406 U. S. 441 (1972); *United States* v. *Worcester,* 190 F. Supp. 548, 558 (D. Mass. 1961).

Of course, none of the standard privileges applies in the present case to Myers's testimony. See G. L. c. 233, §§ 20-20H.

Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro* v. *United States*, 353 U. S. 53, 60-61 (1957). It is revealing of the courts' approach that nondisclosure is rather readily countenanced at pre-trial hearings, but not so at the trial itself. See *McCray* v. *Illinois*, 386 U. S. 300, 305-309 (1967) (motion to suppress); *United States* v. *Harris*, 403 U. S. 573, 585 (1971) (same); *Commonwealth* v. *Monosson*, 351 Mass. 327, 329 (1966) (same); *Commonwealth* v. *Martin*, 362 Mass. 243, 245 (1972) (voir dire on legality of search); *Commonwealth* v. *Ennis*,  Mass. App. Ct.  , (1973) (at trial)[a]; *State* v. *Burnett,* 42 N. J. 377, 385-388 (1964) (motion to suppress); A. B. A. Project on Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial, § 2.6 (b) (Approved Draft 1970). On no analogy to the informer's case could the action of the trial judge here be explained or justified.

With regard to a witness's residence or place of business, that information is usually peripheral to the material evidence, but it may at the same time provide a clue to the vengeful, and so nondisclosure is sometimes tolerated. The teaching of our recent decision of *Commonwealth* v. *McGrath,* 364 Mass. 243, 250-252 (1973), construing and applying the concurring opinion in *Smith* v. *Illinois,* 390 U. S. 129, 133-134 (1968), is that it is for the prosecution (or the witness) to make a showing of a basis for excuse, normally an actual threat, which is then to be set by the judge, in the exercise of a reasoned discretion, against the defendant's actual need for the information. There may be some circumstances in which the threat is inherent and would not require specific demonstration. The *McGrath* opinion points out that a refusal without inquiry or reason to permit a question about a witness's address would generally work a denial of the defendant's constitutional right of confrontation. 364 Mass. at 251-252 (1973). In the

[a] 301 N. E. 2d 589.

*McGrath* case, where nondisclosure was tolerated (the result was otherwise in *Smith* v. *Illinois*), the witness was the alleged victim of a rape and kidnapping. The defence knew well before trial that she would be the key witness. Her address at the time of the offence was disclosed, but her current address was withheld. The Commonwealth objected to the question; defence counsel could not explain the need for the information when the judge inquired.

Our present case has no resemblance to the *McGrath* case because of the potential high importance of the information called for,[8] and stands within the main imperative that a witness must tell what he knows about the cause. But error is shown even if the *McGrath* decision was fully applicable, for there was no attempt by the judge at orderly appraisal of the actuality of any threat and the materiality of the testimony sought. Nor was any compromise considered that might allow disclosure while minimizing danger to the witness.[9] The contrast between the judge's action here and the painstaking efforts of courts presented with problems of withholding witnesses' addresses could hardly be sharper or more telling.[10]

We conclude that Myers should have been ordered to give up the names of the second man and the girl friend. We need not speculate about whether Myers would have complied. But it is worth noting that his earlier insistence that he did not know the second man was abandoned when he was even slightly pressed. He perhaps sought only to be commanded, so that the onus for the disclosure would be on

---

[8] Compare the suggestion in the *McGrath* case, 364 Mass. at 250, n. 4 (1973), that the address of the victim could not have been withheld if it was needed in order to locate her and call her as a witness.

[9] Private disclosure to defence counsel is sometimes a possible expedient. See the *McGrath* case, 364 Mass. at 252-253, n. 5 (1973).

[10] See *United States* v. *Palermo,* 410 F. 2d 468 (7th Cir. 1969); *United States* v. *Caldarazzo,* 444 F. 2d 1046 (7th Cir. 1971), cert. den. sub nom. *DeLegge* v. *United States,* 404 U. S. 958 (1971); *United States* v. *Alston,* 460 F. 2d 48, 50 (5th Cir. 1972); *United States* v. *LaBarbera,* 463 F. 2d 988, 990 (7th Cir. 1972); *United States* v. *Ott,* 489 F. 2d 872 (7th Cir. 1973). See also *People* v. *Mascarenas,* 21 Cal. App. 3d 660, 666-668 (1971); Wigmore, *supra,* at § 2374 (Supplement to McNaughton rev. 1961 at p. 765, citing *People* v. *Nettles,* 34 Ill. 2d 52 [1966], and *State* v. *Cookson,* 361 S. W. 2d 683 [Mo. 1962]); note, 85 Harv. L. Rev. 994, 1014-1017 (1972) (informants).

the court, not on himself. If the order itself would not elicit an answer, exhortation might; failing that, there could be a reminder of, and finally punishment for, contempt. *In re Loughran,* 276 F. Supp. 393 (C. D. Cal. 1967). Wigmore, *supra,* at §§ 2195, 2374. Annotation, 76 A. L. R. 2d 262, 306-307 (1961).[11] But the defendant was entitled in the first place to an order.

The Commonwealth — which, to do it justice, did not support Myers at trial in his refusal to testify — presents little in its briefs in this court to sustain the trial judge's action. It argues, first, that there was no harm because defence counsel already knew the name of Myers's girl friend to be Marlene Mack and the name of the second man to be Willie Bennett. But Myers twice stated at trial that the girl friend who accompanied him to 71 Prentiss Street was not Marlene Mack. Franklin indeed testified that the defendant stated to him that Bennett participated, but the defendant by no means agreed that he had made any such statement, and was entitled to hear Myers's version of the shooting including the identity of the defendant's supposed companion. There is, moreover, no requirement that a defendant, denied access to evidence that might prove helpful in his defence, must make a specific showing of just what the evidence would have proved and how far he was prejudiced by the withholding. See *Commonwealth* v. *Balliro,* 349 Mass. 505, 517 (1965) (denial of access to secluded witness); *Commonwealth* v. *Ennis,*      Mass. App. Ct.    ,   -   (1973) (withholding of informer's identity);[b] *Alford* v. *United States,* 282 U. S. 687, 692-693 (1931) (address of witness); *Roviaro* v. *United States,* 353 U. S. 53, 63-64 (1957) (identity of informer); *Davis* v. *Alaska,* 415 U. S. 308, 318 (1974) (prosecution witness's

---

[11] Where adequate cross-examination could not be compelled, courts have struck the direct testimony of the witness. See *United States* v. *Cardillo,* 316 F. 2d 606, 611-613 (2d Cir. 1963), cert. den. 375 U. S. 822 (1963); *Smith* v. *United States,* 331 F. 2d 265 (8th Cir. 1964); *Rutger* v. *Walken,* 143 P. 2d 866 (Wash. 1943); *People* v. *Barthel,* 231 Cal. App. 2d 827 (1965); Morgan, Some Problems of Proof 130 (1956); annotation, 76 A. L. R. 2d 262, 302-305 (1961).

[b] 301 N. E. 2d 589, 592.

juvenile delinquency record and probationary status); *United States* v. *Alston*, 460 F. 2d 48, 51 (5th Cir. 1972) (address of undercover Federal narcotics agent).

3. The defence had taken the precaution of securing a number of explicit orders for disclosure by the prosecution, one of which, entered some seventeen days before trial began, called for disclosure of evidence favorable to the accused, including evidence that could be used to impeach a Commonwealth witness or that constituted "prior inconsistent statements by a declarant." The sense of the order as well as of the communications between prosecution and defence was that the evidence was to be turned over promptly. Nevertheless Myers's signed statement of December 7 was not passed to the defence until Sergeant Francis Whalen, the investigating officer in charge of the case, actually testified at trial and revealed on cross-examination that such a statement existed. It will be recalled that Myers's girl friend is mentioned in the December 7 statement but not in the December 8 statement. If it could be plausibly argued, as mitigating the judge's error in refusing to press Myers for his girl friend's name, that a vigilant defence could have found it out independently, it is a fair answer that the defence had no clue to the relevance of a girl friend until Whalen testified. The prosecutor said that he himself was unaware of the existence of the December 7 statement until the revelation at trial, but that he had orally communicated to defence counsel the substance of Myers's story of December 7. Such a communication could hardly be the equivalent of the document itself; in any case it seems clear that it did not include any reference to the girl friend.

Also not communicated to defence counsel until Whalen testified was Myers's reference on December 7 to a "Gary Pritcher" as having "got to the white man" with Myers after the black men fled. Here was a possible direct witness to the whole episode. The December 8 statement mentions a "social worker, Pritchard," but only as one of a crowd. Defence counsel said in connection with the new trial motion that he had tried to locate "Pritchard" after reading

the December 8 statement, but had failed. Had he had the December 7 statement earlier, and with the added stimulus of a remark by Myers placing "Pritcher" as a possible eyewitness, the result might have been different.

By the time of the motion for the new trial, made within two weeks of the close of trial, one Gary Pritchett had been discovered by defence counsel — but, counsel averred, only by chance. (This notwithstanding the fact that Pritchett was known to the defendant.) Pritchett swore affidavits in support of the motion and later testified at the hearing of the motion. Pritchett swore in his affidavits that he was at the intersection of Prentiss and Parker streets when he heard gunshots. Instantly he saw three men running from 71 Prentiss Street toward 61 Prentiss Street. He ran toward them and recognized one as Kenneth Myers, whom he knew well; the other two he did not recognize, but he could discern that neither was the defendant, whom he had also known well. The two entered 61 Prentiss Street, but Myers stopped before reaching there and returned with Pritchett to the entrance of 71 Prentiss Street. Myers never left Pritchett's sight until he was taken away in the police car, and did not enter 61 Prentiss Street in that interval. Pritchett further swore that he told his story to a police officer at the scene who took his name and made notes. He said he had not known that anyone had been charged with the crime until defence counsel found him. Pritchett's oral testimony accorded with his affidavits. The Commonwealth showed that Pritchett's family was friendly with the defendant's, and doubt was cast on whether, assuming Pritchett's location and movements as sworn to, he could have had a sufficient view of the men who fled toward 61 Prentiss Street. Pritchett identified Officer DiFonzo (in civilian clothes in the court room) as the policeman to whom he had volunteered his information. DiFonzo did not recall such an incident. (Myers in cross-examination at trial had referred to a "youth worker" in the crowd at 71 Prentiss Street giving a police officer his, Myers's, name and saying he saw Myers running from the scene.) The judge evidently did not believe Pritchett and

did not think his evidence to be an adequate reason for the extraordinary step of reopening the case, but that is not to say that the jury might not have believed Pritchett in the first instance.

We mention in the margin indications of other omissions or delay in carrying out pre-trial orders.[12] It is unnecessary to spin out to a fine point the question whether the slackness might possibly have trenched upon a constitutional right.[13] Nor is it suggested that there was an intention by anyone, least of all on the part of the able and forceful prosecuting attorney, deliberately to withhold material from the defence. What we have here is over-worked counsel who by reason of calendar pressures was compelled to defer serious preparation for trial until shortly before the event, and was therefore quite naturally embarrassed in assembling and marshalling material and in communicating it to the defence. But especially when this aspect of the case is considered, we are reinforced in our view that reversal is called for.

*Judgment reversed.*
*Verdict set aside.*

---

[12] A pre-trial order requiring the prosecution to disclose offers of reward and the like to prosecution witnesses was not complied with in the case of Franklin. Under a pre-trial order to disclose statements by the defendant, the prosecution did communicate orally to the defence that Franklin said the defendant had made a statement to him admitting the shooting, but Franklin's testimony at trial added the suggestion that the motive of the incident at 71 Prentiss Street was robbery. There was some evidence on the new trial application that Franklin recanted this suggestion after trial when interviewed by defence counsel. Franklin could not be located for appearance at the new trial hearing.

The statement claimed to have been made by the defendant to the arresting officer eight days after the crime was not communicated until two days before trial.

[13] Cf. *Commonwealth* v. *Earl*, 362 Mass. 11 (1972); *Commonwealth* v. *Masskow*, 362 Mass. 662 (1972); *Brady* v. *Maryland*, 373 U. S. 83 (1963); *Moore* v. *Illinois*, 408 U. S. 786 (1972); *United States* v. *Keogh*, 391 F. 2d 138 (2d Cir. 1968); annotation, 34 A. L. R. 3d 16 (1970).